# Officers of the United States Within the Meaning of the Appointments Clause

A position to which is delegated by legal authority a portion of the sovereign powers of the federal government and that is "continuing" is a federal office subject to the Constitution's Appointments Clause. A person who would hold such a position must be properly made an "Officer[] of the United States" by being appointed pursuant to the procedures specified in the Appointments Clause.

April 16, 2007

MEMORANDUM OPINION FOR THE GENERAL COUNSELS
OF THE EXECUTIVE BRANCH

I. The Safeguards of the Appointments Clause ....................................................... 74

II. The Essential Elements of an Office Subject to the Appointments Clause ...... 76

    A. The Position Must Possess Delegated Sovereign Authority of the Federal Government ................................................................................ 78

        1. The Foundations of This Element ...................................................... 78

        2. Defining Delegated Sovereign Authority........................................... 87

        3. Three Arguably Relevant Characteristics ......................................... 93

            a. Discretion.................................................................................... 93

            b. Contractors................................................................................. 96

            c. State Officers ............................................................................. 99

    B. The Position Must Be "Continuing".......................................................... 100

        1. The Foundations of This Element ..................................................... 101

        2. Defining a "Continuing" Position ..................................................... 111

        3. A Few Recurring Areas .................................................................... 113

    C. Several Additional Criteria Are Incidental, Not Distinct Elements of an Office.................................................................................................... 115

        1. Method of Appointment.................................................................... 115

        2. Established by Law............................................................................ 117

        3. Oath of Office ................................................................................... 119

        4. Emoluments ...................................................................................... 119

        5. Commission ...................................................................................... 122

III. Conclusion ...................................................................................................... 122

This memorandum addresses the requirements of the Appointments Clause of the Constitution, which sets out the exclusive methods of appointing all "Officers of the United States" whose appointments are not otherwise provided for in the Constitution. U.S. Const. art. II, § 2, cl. 2. In particular, we address which positions are required by that Clause to be filled pursuant to its procedures. We conclude that any position having the two essential characteristics of a federal "office" is subject to the Appointments Clause. That is, a position, however labeled, is in

fact a federal office if (1) it is invested by legal authority with a portion of the sovereign powers of the federal government, and (2) it is "continuing." A person who would hold such a position must be properly made an "Officer[] of the United States" by being appointed pursuant to the procedures specified in the Appointments Clause.

## I. The Safeguards of the Appointments Clause

The Appointments Clause provides:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

*Id*. The Appointments Clause, as the Supreme Court has explained, reflects more than a "frivolous" concern for "etiquette or protocol." *Buckley v. Valeo*, 424 U.S. 1, 125 (1976) (per curiam). Rather, the Clause limits the exercise of certain kinds of governmental power to those persons appointed pursuant to the specific procedures it sets forth for the appointment of "officers." As the Supreme Court explained in *Buckley*:

> We think that the term "Officers of the United States" as used in Art. II, defined to include "all persons who can be said to hold an office under the government," is a term intended to have substantive meaning. We think its fair import is that any appointee exercising significant authority pursuant to the laws of the United States is an "Officer of the United States," and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of that Article.

*Id.* at 125–26 (citation omitted; quoting *United States v. Germaine*, 99 U.S. 508, 510 (1879)); *see also id*. at 132 ("Unless their selection is elsewhere provided for, *all* officers of the United States are to be appointed in accordance with the Clause. . . . No class or type of officer is excluded because of its special functions."); *id*. at 136 (noting that prior cases allowing restrictions on President's removal power had been careful not to suggest that his appointment power could be infringed). Applying this understanding, the Court in *Buckley* unanimously held that the Appointments Clause required that the enforcement, regulatory, and other administrative powers of the Federal Election Commission could properly "be exercised only by 'Officers of the United States,' appointed in conformity with"

the Clause. *Id.* at 143; *see id.* at 267 (White, J., concurring in part and dissenting in part) (agreeing). Because the members of the Commission had not been so appointed, the Commission could not constitutionally exercise these powers. *Id.* at 141–43 (opinion of Court); *see also id.* at 126–27 (describing existing appointment procedure).

This Office also has long taken the same view of the force of the Appointments Clause. We have concluded, for example, that it is not "within Congress's power to exempt federal instrumentalities from the Constitution's structural requirements, such as the Appointments Clause"; that Congress may not, for example, resort to the corporate form as an "artifice" to "evade the 'solemn obligations' of the doctrine of separation of powers," *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 148 n.70 (1996) ("*Separation of Powers*"); and that the "methods of appointment" the Appointments Clause specifies "are exclusive," *Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248, 249 (1989) ("*Legislative Encroachments*"). Indeed, the Court's conclusion in *Buckley* that the methods of appointment in the Appointments Clause are exclusive for anyone who can be said to hold an office under the United States was anticipated by a line of Attorney General opinions dating back to well before the Civil War. *See, e.g.*, *Appointment and Removal of Inspectors of Customs*, 4 Op. Att'y Gen. 162, 164 (1843); *see also Civil Service Comm'n*, 13 Op. Att'y Gen. 516, 518 (1871) (Appointments Clause "must be construed as excluding all other modes of appointment" of executive and judicial officers). Moreover, the text of the Appointments Clause emphatically applies to "all" officers of the United States, unless their method of appointment is "otherwise provided for" in the Constitution.

The requirements of the Appointments Clause are "among the significant structural safeguards of the constitutional scheme" and are "designed to preserve political accountability relative to important government assignments." *Edmond v. United States*, 520 U.S. 651, 659, 663 (1997). The Clause "is a bulwark against one branch aggrandizing its power at the expense of another branch," particularly by preventing Congress from taking to itself the appointment power, as was at issue in *Buckley*, or otherwise stripping that power from the other Branches. *Ryder v. United States*, 515 U.S. 177, 182 (1995). By vesting the selection of principal officers in the President and of inferior officers in the President or certain other officers of the Executive or Judicial Branches, the Clause "prevents congressional encroachment upon" those branches, *Edmond*, 520 U.S. at 659, and supports the President's authority and duty to see to the execution of the laws, *Printz v. United States*, 521 U.S. 898, 922–23 (1997). But the Appointments Clause "is more: it preserves another aspect of the Constitution's structural integrity by preventing the diffusion of the appointment power." *Ryder*, 515 U.S. at 182 (internal quotation marks omitted). Thus, in *Ryder* the Court held invalid a military court's affirmance of a conviction where, even though the court had been appointed by an Executive

Branch officer, the appointing official was not among those specified in the Appointments Clause. *Id*. at 179; *see also United States v. Maurice*, 26 F. Cas. 1211, 1216, 1219 (C.C.D. Va. 1823) (No. 15,747) (Marshall, Circuit Justice) (finding appointment by cabinet member, rather than President with Senate advice and consent, invalid under the Appointments Clause and stating that "the policy of the law condemns such appointments," although illegal appointment did not prevent governmental suit to recover money from appointee); *cf. Auffmordt v. Hedden*, 137 U.S. 310, 326–28 (1890) (rejecting Appointments Clause challenge to action of appraiser appointed by inferior Executive Branch officer—not because Clause did not impose constraints but because position was not an office). By preventing diffusion, the Appointments Clause helps to ensure accountability for the quality of appointments and the operation of the government—through a limited number of publicly known and readily discernible sources of appointing authority, and also, ultimately, through the threat of impeachment, by which Congress may both remove a person from any civil "Office" and disqualify him "to hold and enjoy any Office." U.S. Const. art. II, § 4; *id.* art. I, § 3.[1]

## II. The Essential Elements of an Office
## Subject to the Appointments Clause

Although *Buckley* and subsequent cases confirm that the Appointments Clause limits the conferral of certain kinds of governmental authority to properly appointed "officers," the Supreme Court has not articulated the precise scope and application of the Clause's requirements; the Executive Branch, as explained below, has adopted differing interpretations since *Buckley*; and questions about the Clause continue to arise regularly both in the operation of the Executive Branch and in proposed legislation. We therefore have reconsidered the scope of the Clause's requirements; in doing so, we have focused on relevant constitutional text and the earliest authorities that illuminate that text, as well as Supreme Court authority. The remainder of this memorandum explains the basis for and contours of the two elements of an "office" under the United States whose occupant must

---

[1] This memorandum does not address other separation of powers principles that might restrict the allocation of appointing authority or the exercise of governmental powers, including the "anti-aggrandizement" principle, constraints on the delegation of power outside of the federal government, and the powers and duties of the President under Article II, such as his duty under the Take Care Clause. *See, e.g.*, *Separation of Powers*, 20 Op. O.L.C. at 131–32, 175–77; *Deputization of Members of Congress as Special Deputy U.S. Marshals*, 18 Op. O.L.C. 125 (1994); *Springer v. Philippine Islands*, 277 U.S. 189, 203 (1928) (applying separation of powers principles to interpret statute as barring territorial legislature from appointing persons to vote government's stock in a corporation, regardless of whether such persons "are public officers in a strict sense").

be appointed in accordance with the Appointments Clause.[2] This memorandum discusses and explains the governing principles, which are consistent with and expand on *Buckley* and the precedents on which it relied. But apart from the few specific instances that we expressly consider (such as *qui tam* relators and independent counsels, below in Part II.B.3), this memorandum is not intended to address whether any particular position would be an office or to call into question any particular existing position. Please consult this Office should any particular Appointments Clause question arise that you are unable to resolve based on the principles we set out.

Subpart A explains that a federal office involves a position to which is delegated by legal authority a portion of the sovereign powers of the federal government. Such powers primarily involve binding the government or third parties for the benefit of the public, such as by administering, executing, or authoritatively interpreting the laws. Delegated sovereign authority also includes other activities of the Executive Branch concerning the public that might not necessarily be described as the administration, execution, or authoritative interpretation of the laws but nevertheless have long been understood to be sovereign functions, particularly the authority to represent the United States to foreign nations or to command military force on behalf of the government. By contrast, an individual who occupies a purely advisory position (one having no legal authority), who is a typical contractor (providing goods or services), or who possesses his authority from a state does not hold a position with delegated sovereign authority of the federal government and therefore does not hold a federal office.

Subpart B explains that, for a position to be a federal office, it also must be "continuing," which means either that the position is permanent or that, even though temporary, it is not personal, "transient," or "incidental." Thus, special diplomatic agents, short-term contractors, *qui tam* relators, and many others in positions that have authority on an ad hoc or temporary basis do not hold offices. Persons holding such non-continuing positions need not be appointed in conformity with the Appointments Clause, even if they temporarily exercise delegated sovereign authority. Primarily because of this element, our analysis departs from that taken in such prior memoranda as *Legislative Encroachments*, 13 Op. O.L.C. at 249, and *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 221–24 (1989).

Finally, Subpart C discusses additional criteria that have been considered in certain contexts for determining when a position is an office or when an individual is an officer. At least for purposes of the Appointments Clause, these criteria are

---

[2] Even if the Appointments Clause applies to a position, the Clause does permit various means of relieving administrative burdens on the appointing officer. *See Assignment of Certain Functions Related to Military Appointments*, 29 Op. O.L.C. 132, 133-38 (2005).

not essential, even if relevant to determining the presence of the two essential elements. In many cases, they are incidental traits that often flow from the existence of an office but do not *define* an office. One such criterion, which this Office previously considered essential, is whether a position involves employment within the federal government. *See Separation of Powers*, 20 Op. O.L.C. at 145–48. As suggested when we formally published *Separation of Powers* in 2002, this prior analysis has been found "inadequate as an expression of the Office's advice on separation of powers." *Id*. at 124 (editor's note). As we explain, federal employment is not necessary for the Appointments Clause to apply. In addition, we explain that the statutory basis for a position ordinarily will be relevant to whether the position involves delegated sovereign authority and is continuing, and thus is an "office" subject to the Appointments Clause, although the applicability of the Clause does not depend on whether Congress has formally and directly created an "office."

### A. The Position Must Possess Delegated Sovereign Authority of the Federal Government

The first essential element of an office under the United States is the delegation by legal authority of a portion of the sovereign powers of the federal government. A position must have the authority to exercise such power before the Appointments Clause will require that the occupant of the position be made an "Officer[] of the United States." After laying out the authority for this element, we explain its contours and then address three arguably special situations.

### 1. The Foundations of This Element

The text and structure of the Constitution reveal that officers are persons to whom the powers "delegated to the United States by the Constitution," U.S. Const. amend. X, are in turn delegated in order to be carried out. The President himself is said to "hold [an] Office," and the Constitution provides that "[t]he executive Power shall be vested in" that office. *Id*. art. II, § 1, cl. 1. The President cannot carry out the executive power alone, and so the Constitution further contemplates that executive power will be delegated to officers to help the President fulfill this duty. The Constitution recognizes that the President would need to delegate authority to others in, among other places, the clauses empowering him to "*take Care* that the Laws *be* faithfully executed," and then, immediately following, providing that the President "shall Commission all the Officers of the United States." *Id*. § 3 (emphases added). The Constitution also provides that the President "may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices." *Id*. § 2, cl. 1. *See also id*. art. I, § 6 (barring members of Congress in certain cases from being "appointed to any civil Office under the Authority of the

United States"); *id.* § 8, cl. 18 (referring to the "Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof"); *cf. id.* cls. 15–16 (referring to "the Officers" of the militia, who, when called into federal service, provide one means of executing federal law).

As the Supreme Court has explained: "The Constitution does not leave to speculation who is to administer the laws enacted by Congress; the President, it says, 'shall take Care that the Laws be faithfully executed,' Art. II, § 3, personally and through officers whom he appoints (save for such inferior officers as Congress may authorize to be appointed by the 'Courts of Law' or by 'the Heads of Departments' who are themselves Presidential appointees), Art. II, § 2." *Printz*, 521 U.S. at 922; *see In re Neagle*, 135 U.S. 1, 63 (1890) (President's authority to appoint and commission officers is "the means of fulfilling" his obligation under the Take Care Clause); *Myers v. United States*, 272 U.S. 52, 133 (1926) (same); *The President and Accounting Officers*, 1 Op. Att'y Gen. 624, 625 (1823) (similar). *Printz* was echoing President Washington, who explained in 1789 that "[t]he impossibility that one man should be able to perform all the great business of the State, I take to have been the reason for instituting the great Departments, and appointing officers therein, to assist the supreme Magistrate in discharging the duties of his trust." 30 *Writings of George Washington* 333, 334 (May 25, 1789) (John C. Fitzpatrick ed., 1939).[3] Similarly, the Constitution describes the persons to whom is delegated the "judicial Power of the United States," a particular kind of power to render binding interpretations of federal law (in the course of deciding cases or controversies), as "hold[ing] . . . Offices." U.S. Const. art. III, § 1. This power is primarily delegated to the "Judges of the supreme Court," *id*. art. II, § 2, cl. 2; and the "Judges . . . of the . . . inferior Courts," *id.* art. III, § 1; but also to other officers, *see Buckley*, 424 U.S. at 126 (clerk, *citing Ex parte Hennen*, 38 U.S.

---

[3] Regarding the significance of the President's constitutional status as head of the Executive Branch, and his take-care duty, to the nature of an office as a delegation of executive power, *see also* James Madison, *Notes of Debates in the Federal Convention of 1787*, at 324 (Norton 1987) (Gouverneur Morris, July 19, 1787) ("There must be certain great officers of State; a minister of finance, of war, of foreign affairs &c. These he presumes will exercise their functions in subordination to the Executive, and will be amenable by impeachment to the public Justice. Without these ministers the Executive can do nothing of consequence."); 1 Annals of Cong. 481 (James Madison, June 16, 1789) ("if any power whatsoever is in its nature executive, it is the power of appointing, overseeing, and controlling those who execute the laws"); *id.* at 492 (Fisher Ames, June 16, 1789) ("[I]t was necessary to delegate considerable powers . . . . The constitution places all executive power in the hands of the President, and could he personally execute all the laws, there would be no occasion for establishing auxiliaries; but the circumscribed powers of human nature in one man, demand the aid of others."); *id.* at 637 (Theodore Sedgwick, June 29, 1789) (stating that Representative Sedgwick "conceived that a majority of the House had decided that all officers concerned in executive business should depend upon the will of the President for their continuance in office; and with good reason, for they were the eyes and arms of the principal Magistrate, the instruments of execution").

(13 Pet.) 230 (1839)); 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1530, at 387 (1833) ("Story") (clerk and reporter).[4]

The debate on the ratification of the Constitution reinforces both this textual understanding of a federal "office" as characterized by the delegated sovereign authority of the federal government and the relation of the Appointments Clause to such a position. James Madison argued in the *Federalist* that the Constitution would establish a republican government, which he defined as one that "derives all its powers directly or indirectly from the great body of the people; and is administered by persons holding their offices during pleasure, for a limited period, or during good behavior." *The Federalist* No. 39, at 251 (Jacob E. Cooke ed., 1961). Alexander Hamilton similarly explained in *Federalist* No. 72 that the Executive Branch would be administered by appointed officers exercising the delegated executive power of the President:

> The administration of government . . . in its most usual and perhaps in its most precise signification . . . falls peculiarly within the province of the executive department. The actual conduct of foreign negotiations, the preparatory plans of finance, the application and disbursement of the public moneys, in conformity to the general appropriations of the legislature; the arrangement of the army and navy, the direction of the operations of war; these, and other matters of a like nature constitute what seems to be most properly understood by the administration of government. *The persons therefore, to whose immediate management these different matters are committed, ought to be considered as the assistants or deputies of the chief magistrate; and, on this account, they ought to derive their offices from his appointment*, at least from his nomination, and ought to be subject to his superintendence.

*Id*. at 486–87 (emphasis added); *see also The Federalist* No. 29, at 183 (Alexander Hamilton) (referring to "the officers who may be entrusted with the execution of [the] laws"); *cf. The Federalist* No. 64, at 436 (John Jay) (referring to Constitution's allocation of "power to do" each "act of sovereignty by which the citizens are to be bound and affected," such as making laws, making treaties, and entering court judgments).

---

[4] The Constitution specially provides for the election of representatives and senators, for each house of Congress to choose its legislative officers (except for the President of the Senate, an office held *ex officio* by the Vice President), and for the election of the President and Vice President. *See* U.S. Const. art. I, § 2, cl. 5; *id.* art. I, § 3, cl. 5; *id.* art. II, § 1 & amend. XII. These offices are therefore excluded from the Appointments Clause by its terms.

The earliest commentators shared and perpetuated the *Federalist*'s understanding of a federal office as involving the wielding of delegated sovereign authority. William Rawle explained in the 1820s in his prominent commentary on the Constitution that one of "the means provided to enable the president to perform his public duties" is creation of "[s]ubordinate offices," *A View of the Constitution of the United States of America* 151–52 (2d ed. 1829); described the appointment of officers as the means to allow the President "agents . . . for public duties," *id*. at 162; and supported the power to impeach officers because "[t]he delegation of important trusts, affecting the higher interests of society, is always from various causes liable to abuse," *id*. at 211. Joseph Story in the 1830s echoed Madison by explaining that "in a republican government[,] offices are established, and are to be filled . . . for purposes of the highest public good; to give dignity, strength, purity, and energy to the administration of the laws." 3 Story § 1524, at 376. In his view, the Appointments Clause "give[s] to the president a power over the appointments of those, who are in conjunction with himself to execute the laws." *Id.* Attorney General Cushing in the 1850s, surveying the law and practice regarding the operation of the Executive Branch, similarly explained that "the lawful will of the President may be announced, and an act in the authority of the President performed, not merely by a Head of Department, but, in the second or other degree of delegation, by some officer subordinate to such head." *Relation of the President to the Executive Departments*, 7 Op. Att'y Gen. 453, 473 (1855). *See also The Jewels of the Princess of Orange*, 2 Op. Att'y Gen. 482, 489 (1831) (discussing case in which by statute the President "could only act through his subordinate officer" but might issue an order to that officer and enforce it through his removal power); John N. Pomeroy, *An Introduction to the Constitutional Law of the United States* § 642, at 425 (7th ed. 1883) ("Pomeroy") ("the officers, in all their various subordinate grades, are the means and instruments by which the laws shall be executed, and the general functions and duties of the department performed").

The common law of the time of the Founding also indicates that delegated sovereign authority is a key characteristic of an office. In late eighteenth century England, "offices" involved a "duty, and in the next place the charge of such duty." Giles Jacob, *A New Law Dictionary*, tit. Office (9th ed. 1772) ("Jacob"); see also 2 T. Cunningham, *A New and Complete Law Dictionary*, tit. Office (2d ed. 1771) (same) ("Cunningham"); 3 Matthew Bacon, *A New Abridgment of the Law* (4th ed. 1778) (same). "[A]n 'officer,'" then, "was simply one whom the King had charged with a duty." Edward S. Corwin, *The President: Office and Powers 1789–1948*, at 85 (5th ed. 1984). A public officer (as distinct from a private one) was someone whom the King had charged with "any duty concerning the publick." Jacob, *tit.* Office; Cunningham, *tit.* Office. More particularly, public offices involved authority to "affect the people generally," John Bouvier, *A Law Dictionary* 203 (1839) (1993 reprint) ("Bouvier"), and "entitle[d] a man to act in the affairs of others without their appointment or permission," P.G. Osborn, *A Concise*

*Law Dictionary* 223 (2d ed. 1937); 2 Stewart Rapalje & Robert Lawrence, *A Dictionary of American and English Law* 895 (1883) (same).

Thus, the general common law rule for public offices at the Founding was that "where one man hath to do with another's affairs against his will, and without his leave, that this is an office, and he who is in it, is an officer." Jacob, *tit.* Office; Cunningham, *tit.* Office (same). The dictionaries derived this rule, essentially verbatim, from the reported arguments of the Crown in the early case of *King v. Burnell*, Carth. 478 (K.B. 1700). *See id*. at 478 (so stating the "Rule"). *Burnell* involved the Censor of the College of Physicians, and the Crown contended that he was a public officer (and therefore subject to an oath requirement) because (1) the King had the duty to take "Care of the Persons of his Subjects, and consequently of their health"; (2) he had "delegated so much of his Office unto those Censors"; and (3) "he is an Officer subordinate, who hath any Part of the King's publick care delegated to him by the King." *Id*. at 478–79; *see also id*. at 479 (argument for doctor, not denying general rule as applied to revenue officers and officers of the peace but claiming exception for "particular Powers created for particular Purposes"). The Founders, several decades after *Burnell*, had a similar (albeit less favorable) view of the characteristics of a public office: The Declaration of Independence charged that King George III had "erected a Multitude of new Offices, and sent hither Swarms of Officers to harass our People, and eat out their Substance." *Declaration of Independence* ¶ 12 (U.S. 1776). Two years before, the First Continental Congress had written of "oppressive officers" who needed, by means of the freedom of the press, to be "shamed or intimidated into more honorable and just modes of conducting affairs." Appeal to the Inhabitants of Quebec, 1 *Journals of the Continental Congress* 105, 108 (1774). Officers, thus, were persons holding sovereign authority delegated from the King that enabled them in conducting the affairs of government to affect the people "against [their] will, and without [their] leave." *Burnell*, Carth. at 478. So critical to the Founders' thinking was the abuse of power and the corruption surrounding public offices that "'the power of appointment to offices' was deemed 'the most insidious and powerful weapon of eighteenth century despotism.'" *Freytag v. Comm'r*, 501 U.S. 868, 883 (1991) (quoting Gordon Wood, *The Creation of the American Republic 1776–1787*, at 143 (1969)); *see generally* Bernard Bailyn, *The Origins of American Politics* 63–91 (1970) (discussing the Founders' complaints about the power of royal officials); *The Federalist* No. 76, at 509–10 (Alexander Hamilton) (praising the Appointments Clause as likely "to promote a judicious choice of men for filling the offices of the Union," on which choices "must essentially depend the character of [the government's] administration," which was, in turn, "'the true test of a good government'").

Authority from the Nation's early years addressing the nature of a public office confirms this understanding that delegated sovereign authority is a key element. Such post-ratification materials can illuminate the original meaning of the

Constitution where there is no evidence of a break in the law, and we are aware of none here. The Supreme Judicial Court of Maine provided the fullest early explication in 1822, addressing a question under Maine's equivalent of the Ineligibility Clause, U.S. Const. art. I, § 6, cl. 2, which bars members of the Legislative Branch in certain cases from being appointed to a "civil Office under the Authority of the United States":

> [T]he term "office" implies a delegation of a portion of the sovereign power to, and possession of it by the person filling the office;—and the exercise of such power within legal limits, constitutes the correct discharge of the duties of such office. The power thus delegated and possessed, may be a portion belonging sometimes to one of the three great departments, and sometimes to another; still it is a legal power, which may be rightfully exercised, and in its effects it will bind the rights of others . . . .

*Opinion of the Justices*, 3 Greenl. (Me.) 481, 482 (1822). The court added that "[a]n office [is] a grant and possession of a portion of the sovereign power" and that "every 'office,' in the constitutional meaning of the term, implies an authority to exercise some portion of the sovereign power, either in making, executing or administering the laws." *Id.* at 483. Applying this understanding, the court concluded that an agent for the preservation of timber on public lands was not a public officer because he "is to be clothed with no powers, but those of superintending the public lands, and performing certain acts in relation to them under the discretionary regulations of the governor." *Id.* His duties were "not essentially different from" those of the "state printer, or a contractor to build a state house, or a state prison." *Id.* Other courts treated this early analysis as authoritative. *See Bunn v. Illinois*, 45 Ill. 397, 409 (1867) ("The doctrine of this opinion has not been questioned, so far as we are advised, by any court, and it commends itself to our unqualified approbation."); *Patton v. Bd. of Health*, 59 P. 702, 704, 705 (Cal. 1899) (describing doctrine of Maine opinion as the one that has "been held by most courts," and *Bunn* as having "very fully examined" the cases).

Similarly, in *Byrne's Administrators v. Stewart's Administrators*, 3 S.C. Eq. (3 Des. Eq.) 466 (1812), the South Carolina Court of Appeals held that a solicitor was not a public officer because "he does not possess any portion of the public authority." *Id.* at 478; *accord In the Matter of Oaths*, 20 Johns. 492, 492 (N.Y. Sup. Ct. 1823) (private attorneys do not hold an "office or public trust" under state constitution because "they perform no duties on behalf of the government; they execute no public trust"). And in *Commonwealth v. Binns*, 17 Serg. & Rawle 219 (Pa. 1828), the Pennsylvania Supreme Court concluded, consistent with one of the examples given in the Maine opinion, that a person who had contracted to be printer of congressional reports was not an officer. *Id.* at 244 (opinion of Tod, J.). A concurring opinion expressly relied on the Maine opinion in describing a public

office as including "a delegation of a portion of the sovereign power to, and possession of it by, the person filling the office." *Id.* (opinion of Smith, J.). *See also United States v. Hatch*, 1 Pin. 182, 190 (Wis. Terr. 1842) (explaining that the term "*civil officers*" in appointment provision of territory's organic act "was intended to embrace such officers as in whom part of the sovereignty or municipal regulations, or general interests of society are vested; and that such has been the general understanding in the states, under their constitutions," relying on the Maine opinion as quoted in *Binns*); *United States ex rel. Boyd v. Lockwood*, 1 Pin. 359, 363 (Wis. Terr. 1843) (officer has "for the time being, a portion of the sovereignty . . . to be exercised for the public benefit"). Finally, in *United States v. Maurice*, 26 F. Cas. 1211 (C.C.D. Va. 1823), Chief Justice Marshall concluded that the Army's position of "agent of fortifications" was a federal office, where it essentially had the duties of contracting agent—"those of a purchasing quartermaster, commissary, and paymaster." *Id*. at 1214–15. These were "important duties," which, if the President in discharging his duty to erect fortifications did not carry out directly through a series of contracts, would be carried out for him by officers. *Id*. at 1214. In general, Marshall explained, "[a]n office is defined to be 'a public charge or employment,' and he who performs the duties of the office, is an officer." *Id*. Thus, an office could be said to involve the performance of public duties. *See also Eliason v. Coleman*, 86 N.C. 235, 239–40 (1882) (office is "a public position to which a portion of the sovereignty of the country, either legislative, executive or judicial, attaches for the time being, and which is exercised for the benefit of the public") (quotation marks omitted); *State v. Hocker*, 22 So. 721, 722–23 (Fla. 1897) (surveying law of public offices beginning with 1822 Maine decision and *Maurice*).

Reflecting the understanding from the first hundred years of American law, including pre-Founding English law, a leading treatise summarized and defined a public office as follows:

> A public office is the right, authority and duty, created and conferred by law, by which for a given period, either fixed by law or enduring at the pleasure of the creating power, an individual is invested with some portion of the sovereign functions of government, to be exercised by him for the benefit of the public. The individual so invested is a public officer.

Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 1, at 1–2 (1890) (footnote omitted) ("Mechem"). Mechem added that the "delegation . . . of some of the sovereign functions of government" was the "most important characteristic which distinguishes an office," such that "[u]nless the powers conferred are of this nature, the individual is not a public officer." *Id*. § 4, at 5. The "'nature of th[e] duty,'" as "'concerning the public,'" was the key factor. *Id*. § 9, at 7 (quoting *Burnell*, Carth. at 479).

Mechem's distillation of the law was quickly and widely accepted. Contemporaneous commentators concurred. *See* Bruce Wyman, *The Principles of the Administrative Law Governing the Relations of Public Officers* 163 (1903) (essentially reiterating Mechem's definition); James L. High, *A Treatise on Extraordinary Legal Remedies* 581 (3d ed. 1896) ("An office, such as to properly come within the legitimate scope of an information in the nature of a quo warranto, may be defined as a public position, to which a portion of the sovereignty of the country, either legislative, executive or judicial, attaches for the time being, and which is exercised for the benefit of the public."). So did the Judiciary Committee of the House of Representatives in 1899. The House had requested a report on whether any member had "accepted any office under the United States" and whether "the acceptance of such office under the United States ha[d] vacated the seat of the Member" under the Incompatibility Clause, which provides that "no Person holding any Office under the United States" may at the same time be a member of Congress, U.S. Const. art. I, § 6, cl. 2. The Committee extensively surveyed the definition of an "office," particularly relying on Mechem and the 1822 Maine decision, and concluded that membership on "a commission created by law to investigate and report, but having no legislative, judicial, or executive powers," did not constitute an office under the United States. 1 Asher C. Hinds, *Hinds' Precedents of the House of Representatives* 604, 604 (1907). The Committee reasoned that a public office requires a delegation of sovereign authority, which "involves necessarily the power to (1) legislate, or (2) execute law, or (3) hear and determine judicially questions submitted." *Id.* at 607.[5] The commissioners in question, by contrast, "are not to execute any standing laws which are the rules of action and the guardians of rights, nor have they the right or power to make any such law, nor can they interpret or enforce any existing law." *Id.* at 608; *see id.* at 610 ("They neither make law, execute law affecting the rights of the people, nor perform judicial functions," but rather are "mere advisory agents of the Congress. . . . They have no power to decide any question or bind the Government or do any act affecting the rights of a single individual citizen."). Similarly, the Attorney General at the same time explained that, although "[t]he legal definitions of a public office have been many and various," "[t]he idea seems to prevail that it is an employment to exercise some delegated part of the sovereign power."

---

[5] In addition to its conclusion regarding the mere power to investigate and report, the Committee further concluded that "mere power . . . to negotiate a treaty of peace, or on some commercial subject, and report without power to make binding on the Government, does not constitute a person an officer." 1 *Hinds' Precedents* at 607–08. This conclusion is correct, not because, as the report suggests, no delegation of sovereign power is involved in the authority to represent the federal government in foreign relations, but only to the extent that the person exercising that "mere power" does not hold a position that is *continuing*, as discussed below in Part II.B. As discussed in the next subpart, the delegated executive power of the federal government is broader than just the power to execute law, and Mechem did not state otherwise.

*Office—Compensation*, 22 Op. Att'y Gen. 184, 187 (1898); *see also Appointment—Holding of Two Offices—Commissioner of Labor*, 26 Op. Att'y Gen. 247, 249 (1907) (similar, citing 1822 Maine decision).

It was the same House report's quotation of Mechem's definition of a public office (along with the Supreme Court's opinion in *United States v. Hartwell*, 73 U.S. 385 (1867)) on which then-Assistant Attorney General Rehnquist relied in 1969 in concluding that the Staff Assistant to the President did not hold an office within the meaning of the Ineligibility Clause. *See* Letter for Lamar Alexander, Staff Assistant to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel at 2 (Dec. 9, 1969) ("Rehnquist Letter"). Among other reasons, Rehnquist noted that the position had no specified duties. *Id*. at 3. Similarly, in 1971 this Office, in addressing the scope of the Appointments Clause and the related constitutional provision for the President to commission officers, explained that one of the two key "characteristic[s] of an officer of the United States in the Constitutional sense is that he must be invested 'with some portion of the sovereign functions of the government.'" Memorandum for John W. Dean, III, Counsel to the President, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Presidential Commissions* at 3 (Dec. 1, 1971) (quoting Mechem §§ 1, 2 & 4).

The Supreme Court soon thereafter (joined by then-Justice Rehnquist) followed essentially the same analytical path in *Buckley v. Valeo*, the Court's first treatment of the basic requirements of the Appointments Clause since *Auffmordt v. Hedden*, 137 U.S. 310 (1890), *see Buckley*, 424 U.S. at 125–26 & n.162, and its first decision finding a violation of that Clause. In concluding that the commissioners of the Federal Election Commission held offices under the United States and therefore were required to be appointed in accordance with the Appointments Clause, the Court focused on the Commission's powers and concluded that many of those powers involved "the performance of a significant governmental duty exercised pursuant to a public law." 424 U.S. at 141; *see id.* at 269–70 (White, J., concurring in part and dissenting in part) (similar); *see also id.* at 137–41, 143 (opinion of Court, surveying powers). Because of their invalid appointments, the commissioners were permitted to "perform duties only in aid of those functions that Congress may carry out by itself, or in an area sufficiently removed from the administration and enforcement of the public law." *Id*. at 139.

The Court's reference in *Buckley* (and subsequent cases) to the exercise of "significant authority," *id*. at 126, does vary somewhat from the well-established historical formulation, but nothing in the Court's opinion suggests any intention to break with the longstanding understanding of a public office or fashion a new term of art. On the contrary, the Court favorably discussed and cited several of the cases from the 1800s reflecting that understanding, some of them treating arguably insignificant positions as offices. *See id*. at 125–26. The Court also referred simply to the administration and enforcement of the public law, *see id*. at 139 (quoted

above), 141 (same), and explained that "the term 'Officers of the United States,' . . . since it had first appeared in [the draft Constitution,] had been taken by all concerned to embrace all appointed officials exercising responsibility under the public laws of the Nation," *id.* at 131. We therefore take the phrase "significant authority pursuant to the laws of the United States," *id*. at 126, and similar phrases, *see*, *e.g.*, *id*. at 141, to be shorthand for the full historical understanding of the essential elements of a public office; this phrase concisely conveys both the historical concept of delegated sovereign power and the second historical element discussed below—whether the position with such power is "continuing"—which was set out in *Auffmordt*, among much other early authority, and could be considered to bear heavily on the "significan[ce]" of the delegation. This Office previously has suggested such an understanding of *Buckley*. *See* Memorandum for Robert P. Bedell, Deputy General Counsel, Office of Management and Budget, from Ralph W. Tarr, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Executive Director of the Property Review Board* at 5–6 (Apr. 1, 1983); *see also United States ex rel. Stone v. Rockwell Intern. Corp*., 282 F.3d 787, 805 (10th Cir. 2002) (*Buckley* "was clear" that its "definition of an officer of the United States should be construed in conformity with its prior *Germaine* and *Auffmordt* opinions, which the *Buckley* Court extensively quoted with approval.").

## 2. Defining Delegated Sovereign Authority

Although the particulars of what constitutes "delegated sovereign authority" will not always be beyond debate, early authorities as well as more recent court decisions and opinions of this Office provide extensive guidance illuminating the term. As a general matter, based on these authorities, one could define delegated sovereign authority as power lawfully conferred by the government to bind third parties, or the government itself, for the public benefit. As indicated from much of the discussion above, such authority primarily involves the authority to administer, execute, or interpret the law. *See also Printz*, 521 U.S. at 922–23 (Constitution provides that President and the officers he appoints are the ones who are "to administer the laws enacted by Congress" and "execute its laws"); *Bowsher v. Synar*, 478 U.S. 714, 733 (1986) ("Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law."); *Proposed Commission on Deregulation of International Ocean Shipping*, 7 Op. O.L.C. 202, 202 (1983) (holding that positions of commissioners were not subject to the Appointments Clause where they involved "no enforcement authority or power to bind the Government"); 1 *Hinds' Precedents* at 610 (1898 report concluding that certain commissioners were not officers because "[t]hey neither make law, execute law affecting the rights of the people, nor perform judicial functions"; "They have no power to decide any question or bind the Government or do any act affecting the rights of a single individual citizen").

For example, the public authority to arrest criminals, impose penalties, enter judgments, and seize persons or property constitutes delegated sovereign authority. The Supreme Court recognized early that a justice of the peace for the District of Columbia was an officer of the United States. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 164 (1803) (justice of peace holds an office); *Wise v. Withers*, 7 U.S. (3 Cranch) 331, 336 (1806) ("Deriving all his authority from the legislature and president of the United States, he certainly is not the officer of any other government," and "his powers, as defined by law, seem partly judicial, and partly executive"). The New Hampshire Supreme Court likewise concluded early that a "constable" held an office, given his power "to arrest criminals . . . and by execution to seize either the person or property of small debtors," *Town of Meredith v. Ladd*, 2 N.H. 517, 519 (1823), and the Supreme Court of the Wisconsin Territory concluded that a county probate judge held an office, having "for the time being, a portion of the sovereignty . . . to be exercised for the public benefit," *Boyd*, 1 Pin. at 363; *see also Payton v. New York*, 445 U.S. 573, 590 n.30 (1980) (discussing arrest powers of "a peace officer" at common law) (internal quotation marks omitted).[6]

Similarly included in delegated sovereign authority is power to issue regulations and authoritative legal opinions on behalf of the government, and other powers to execute the law whether considered "executive" or merely "administrative." Thus, *Buckley* concluded that both the Federal Election Commission's "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights" and its "rulemaking, advisory opinions, and determinations of eligibility for . . . federal elective office" were authorities that rendered the members of the Commission subject to the Appointments Clause. 424 U.S. at 140; *see id.* at 137 (discussing agency's "functions with respect to . . . fleshing out the statute" and its "functions necessary to ensure compliance with the statute and rules"); *id.* at 110–11 (explaining that the "advisory opinions" at issue

---

[6] The same understanding appears in *Ex parte Pool*, 4 Va. (2 Va. Cas.) 276 (1821). All of the judges of the General Court appeared to agree that a justice of the peace exercised delegated sovereign authority, even while disagreeing about whether a state justice of the peace could, consistent with Article III of the federal Constitution, be authorized by federal law to commit certain persons to jail for trial. The dissent argued that the powers of justices of the peace "to grant warrants of arrest against persons accused of crimes or offences against the Laws of the United States, to examine, bail, or commit the accused, compel the attendance of witnesses, [and] recognize them to appear to give evidence under pain of imprisonment" made them officers under the Appointments Clause. *Id.* at 290–91 (Semple, J., dissenting). The majority of the court did not dispute the relevance of these powers; instead, the majority concluded that the duties were permissible because not "regular and permanent" but rather involving "incidental and occasional matters"—thus relying on the second essential element of an office, discussed below in Part II.B. *Id.* at 279–80. In *Shepard v. Commonwealth*, 1 Serg. & Rawle 1 (Pa. 1814), the court concluded for similar reasons that a special commissioner was not an officer even though he made binding decisions for the state regarding claims to and compensation for certain lands. *Id.* at 9–10.

provided a legal defense to private parties). Likewise, Joseph Story included among the "most important civil officers" those "connected with the administration of justice [and] the collection of the revenue." 3 Story § 1530, at 387.

Apart from matters commonly considered law enforcement or execution, delegated sovereign authority also includes other domestic matters authorized by law that could bind or otherwise affect the government or third parties for the public benefit. Such matters include legal authority over the contracts and "supplies . . . of the nation," *id.* (persons with such authority also are among the "most important civil officers"); *United States v. Tingey*, 30 U.S. (5 Pet.) 115, 126 (1831) (discussing officers "for the purpose of making contracts, or for the purchase of supplies"); *Appointments to the Commission on the Bicentennial of the Constitution*, 8 Op. O.L.C. 200, 207 (1984) (listing as a "purely executive function[]" the "signing [of] legal instruments" on behalf of the government), and "the preparatory plans of finance," *The Federalist* No. 72, at 486; authority over the granting of governmental licenses, *see* Leonard D. White, *The Federalists: A Study in Administrative History* 455 (1948), or to determine the rules for public access to or privileges regarding governmental property, *see In re Corliss*, 11 R.I. 638, 640–42 (1876); *see also Opinion of the Justices*, 3 Greenl. at 483 (contrasting the "discretionary regulations of the governor" regarding the public lands with the subordinate duties of his non-officer agent for the preservation of timber on public lands); and the authority to appoint to or remove from other governmental offices, *see*, *e.g.*, *State v. Kennon*, 7 Ohio St. 546, 562–63 (1857) (these are "important public powers, trusts, and duties"). To take one example, a leading early case, *Shelby v. Alcorn*, 36 Miss. 273 (1858), concluded that a levee commissioner held an office, where the position included authority to set terms for and enter into contracts on behalf of the government for construction of levees, authority to sue to enforce those contracts, "the duties of treasurer, in which position he is entitled to receive large sums of public money," and the ability essentially to levy taxes to fund construction. *Id*. at 289. His powers were "extensive and important, and *such as no one could claim to exercise, except in virtue of a legislative enactment*," and "in the discharge of his proper functions, [he] exercises as clearly *sovereign power* as the governor, or a sheriff, or any other executive officer." *Id*. at 291–92 (emphasis added). *See also*, *e.g.*, *Commonwealth v. Swasey*, 133 Mass. 538, 541 (1882) (city physician, through his authority as an ex officio member of the board of health, has "important powers to be exercised for the safety and health of the people," and so is an officer).

At the same time, the 1822 Maine decision indicates that some functions simply involving the management of governmental property may be considered not "sovereign" but rather proprietary. *See Opinion of the Justices*, 3 Greenl. at 483 ("He is to be clothed with no powers, but those of superintending the public lands, and performing certain acts in relation to them under the discretionary regulations of the governor."); *cf. Springer v. Philippine Islands*, 277 U.S. 189, 203 (1928)

(describing authority to vote government-owned shares of a company's stock as "not sovereign but proprietary in its nature," though declining to give distinction significance in separation of powers challenge to statute); *Constitutional Limits on "Contracting Out" Department of Justice Functions under OMB Circular A-76*, 14 Op. O.L.C. 94, 99 (1990) ("[P]urely ministerial and internal functions, such as building security, mail operations, and physical plant maintenance, which neither affect the legal rights of third parties outside the Government nor involve the exercise of significant policymaking authority, may be performed by persons who are not federal officers or employees.").

As the *Shelby* case indicates, *see* 36 Miss. at 277, delegated sovereign authority further includes, on the one hand, authority on behalf of the government to receive and oversee the public's funds. *See also Corliss*, 11 R.I. at 642 ("office" at least includes a position with authority for "the handling of public money . . . , or the care and oversight of some pecuniary interest of the government"); *Commonwealth v. Evans*, 74 Pa. 124, 139 (1873) (collection agent is "by authority at law, . . . entrusted with the receipt of public moneys" and chargeable with providing such moneys to the treasury); *Tingey*, 30 U.S. at 128 (referring to the "official duties of a receiver . . . of public moneys"). Correspondingly, it also includes authority over the disbursement of those public funds. *See Maurice*, 26 F. Cas. at 1214 (agents of fortifications have duty of "disbursement of the money placed in their hands," consistent with orders of Army engineers); *Tingey*, 30 U.S. at 126–28 (discussing "disbursing officers" and "official duties of . . . an agent for disbursery of public moneys"); 3 Story § 1530, at 387 (civil officers have authority over the "expenditures of the nation"); *Buckley*, 424 U.S. at 140 ("determinations of eligibility for funds" are among duties implicating Appointments Clause). *See generally Military Storekeepers*, 6 Op. Att'y Gen. 4 (1853) (authority to superintend the receiving, safe-keeping, and distribution of military stores and supplies). Alexander Hamilton likewise included within the "administration of government," which ought to be managed by properly appointed officers, "the application and disbursement of the public monies." *The Federalist* No. 72, at 486–87. The President recently implemented this understanding when he avoided Appointments Clause concerns with a private corporation's administration of a fellowship program by "instruct[ing] the head of the department to whose agency these funds are appropriated to treat the money as a grant" to the corporation. Statement by President George W. Bush Upon Signing H.R. 2474, 39 *Weekly Comp. Pres. Doc.* 917, 918 (July 14, 2003), *reprinted in* 2003 U.S.C.C.A.N. 1009.

Finally, delegated sovereign authority of the federal government also encompasses functions that are not necessarily domestic and may not precisely involve the execution of the laws, but that nevertheless are within the "executive Power" that Article II of the Constitution confers, functions in which no mere private party would be authorized to engage. The most notable examples are "[t]he actual conduct of foreign negotiations, . . . the arrangement of the army and navy, [and]

the direction of the operations of war." *The Federalist* No. 72, at 486–87. The positions with authority to do these things have authority lawfully granted by the government to bind or control in some fashion the government or third parties for the public benefit.

Thus, there are military offices. *See* U.S. Const. amend. XIV, § 3 (referring to persons who "hold any office, civil or military, under the United States"); *Burnell*, Carth. at 479 ("Officers are distinguished into Civil and Military, according to the Nature of their several Trusts"); *West Point Cadets*, 7 Op. Att'y Gen. 323, 329 (1855) (describing cadets and naval midshipmen, commissioned by President, as "persons of the class of the 'inferior officers' of the Constitution"); Mechem §§ 22–24, at 10 (recognizing military and naval officers as distinct from civil officers). These positions are primarily characterized by the authority to command in the Armed Forces—commanding both people and the force of the government. *See Bouvier*, *tit.* Officer (defining classes of officers, including "military officers who have command in the army" and "naval officers, who are in command in the navy"); Mechem §§ 22–23, at 10 (reiterating *Bouvier*'s definitions); *West Point Cadets*, 7 Op. Att'y Gen. at 336 (describing brevet second lieutenant as a commissioned officer, "capable by law to command his company in battle, and, *a fortiori . . .* capable of any duty less than that, which can by law be assigned to a second lieutenant"); *People v. Duane*, 121 N.Y. 367, 373 (1890) ("It is difficult to conceive of . . . a military office without the power of command, the right of promotion or the obligation to perform some duty."); *Separation of Powers*, 20 Op. O.L.C. at 144 n.54 ("Even the lowest ranking military or naval officer is a potential commander of United States armed forces in combat."). Such offices necessarily involve a delegation of authority that is implicit in and subordinate to the President's authorities as "Commander in Chief of the Army and Navy of the United States." U.S. Const. art. II, § 2; *compare Relation of the President*, 7 Op. Att'y Gen. at 465 (the President cannot relinquish his authority as Commander in Chief), *with id.* at 479–80 (The President "cannot be substituted in person into all the acts of . . . the officers, soldiers, and sailors of the Army and Navy," and "the actual execution of" the "military business of the Government must, of necessity, devolve on persons subordinate to the President.").

There also are diplomatic offices. They have the delegated sovereign authority to speak and act on behalf of the United States toward or in other nations, whether executing the laws or otherwise: "Public ministers of every class, are *the immediate representatives of their sovereigns*," and consuls likewise, although they "have not in strictness a diplomatic character," are "the public agents of the nations to which they belong." *The Federalist* No. 81, at 548 (Alexander Hamilton) (emphasis added); *see Ambassadors and Other Public Ministers of the United States*, 7 Op. Att'y Gen. 186, 190 (1855) (ambassadors and other public ministers constitute the "class of public officers who . . . [are] agents of their respective governments

for the transaction of its diplomatic business abroad"); *Appointment of Consuls*, 7 Op. Att'y Gen. 242, 248 (1855) (consuls are a "class of public officers . . . appointed by their government to reside in foreign countries"); *United States Judicial Authority in China*, 7 Op. Att'y Gen. 495, 512 (1855) (Appointments Clause applies to subordinate diplomatic officers and consuls). For this reason, President Washington protested upon learning that a private citizen had been participating in treaty negotiations: "Who is Mr. Rosencrantz? And under what authority has he attended the councils of the Indians at Buffalo Creek? . . . No person should presume to speak to the Indians on business of a public nature except those who derive their Authority and receive their instructions from the War Office for that purpose." 32 *Writings of George Washington* 116–17 (John C. Fitzpatrick ed., 1939) (*quoted in* White, *Federalists* at 33); *cf.* Opinion on the Powers of the Senate Respecting Diplomatic Appointments (1790), *in* 16 *Papers of Thomas Jefferson* 378, 379 (Julian P. Boyd ed., 1961) ("The transaction of business with foreign nations is Executive altogether."). And federal law since 1799 has made it a crime for citizens to negotiate with foreign governments regarding the United States without the "authority" of the United States government. *See* Logan Act, 1 Stat. 613, ch. 1 (1799) (codified as amended at 18 U.S.C. § 953 (2000)).

Indeed, the power of a diplomatic office is peculiarly delegated directly by the President, who makes such officers "the unquestionable representatives *pro tanto* of the sovereignty of the United States." *Ambassadors*, 7 Op. Att'y Gen. at 211. A direct presidential delegation is particularly important when diplomatic officers carry out the "most important and solemn act of diplomatic service," the President's authority to "negotiate[] and sign[] a treaty." *Id.* at 212; *see Relation of the President to the Executive Departments*, 7 Op. Att'y Gen. 453, 465 (1855) ("in certain stages of the negotiation of a treaty, anterior to and including its signature, [the President] delegates full powers to another person"); *see also* Act of Feb. 20, 1792, ch. 7, § 26, 1 Stat. 232, 239 (authorizing Postmaster General to "make arrangements" with foreign countries for mail receipt and delivery). Similarly, the delegated authority of consuls has included such clearly sovereign areas as "executing" the "body of laws for the protection of the rights of citizens of the United States in foreign countries." *Appointment of Consuls*, 7 Op. Att'y Gen. at 267. Common powers and duties have included "administrative, and sometimes judicial, functions," and assistance "in the collection of the public revenue" by authenticating documents, as well as various duties and rights defined by treaties and the law of nations. *Id.* at 248–49; *see also Field v. Clark*, 143 U.S. 649, 690 n.1 (1892) (discussing example of consular judicial powers). To the Founders, the proper exercise of such sovereign authority by officers abroad was critical for the security of the Nation. Not only does the Appointments Clause ensure accountability for their appointment by expressly mentioning them, U.S. Const. art. II, § 2, cl. 2; *see also id.* art. III, § 2, cls. 1 & 2, but the Emoluments Clause, *id.* art. I, § 9,

cl. 8, was adopted with particular reference to preventing foreign corruption of such officers. *See Application of the Emoluments Clause to a Member of the President's Council on Bioethics*, 29 Op. O.L.C. 55, 57–58 (2005) ("*Emoluments Clause*").[7]

### 3. Three Arguably Relevant Characteristics

Having shown that the first element of an "office" for purposes of the Appointments Clause is a delegation of the sovereign authority of the federal government, and having given examples of what such sovereign authority involves, we will touch on three characteristics arguably relevant to the delegation of federal sovereign authority. We conclude that the first of these characteristics (having discretion) is not necessary to the existence of such authority, and that the other two (being a contractor and being a state officer) ordinarily do not involve the exercise of such authority.

### a. Discretion

First, "independent discretion" is not a necessary attribute of delegated sovereign authority. *Buckley* is sometimes read to hold that persons who "do not wield independent discretion and [who] act only at the direction of officers" cannot themselves be considered officers. *Separation of Powers*, 20 Op. O.L.C. at 144; *see Constitutional Limitations on Federal Government Participation in Binding Arbitration*, 19 Op. O.L.C. 208, 216 (1995) (same). Neither *Buckley* nor early authority supports this restriction on the scope of an "office."

*Buckley* did rightly indicate that discretion in administering the laws typically will constitute the exercise of delegated sovereign authority, and therefore is of course relevant. *See* 424 U.S. at 138 (discretion to bring civil enforcement suit); *id*. at 140–41 (duties akin to those of regulatory agency); *Freytag*, 501 U.S. at 881–82 (noting that special trial judges "perform more than ministerial tasks" and exercise "significant discretion" in their tasks); *cf*. Mechem §§ 567–68, at 368–70 (discussing rules on ability to delegate the performance of official duties, turning on whether the duties involve judgment and discretion or instead are mechanical or ministerial). But *Buckley* did not say, nor does it follow, that such discretion is *necessary*. Indeed, as already indicated, *Buckley* reaffirmed prior decisions that had concluded that "a postmaster first class" and "the clerk of a district court"

---

[7] In the context of the Ineligibility Clause, this Office has assumed, consistent with an 1895 opinion of the Attorney General and the text of the Clause, that an ambassador holds a "civil Office" subject to the Clause, while also noting arguments to the contrary based on the specific purposes of that Clause. *See Nomination of Sitting Member of Congress to be Ambassador to Vietnam*, 20 Op. O.L.C. 284, 285 & n.5 (1996).

were officers of the United States. 424 U.S. at 126 (citing *Myers v. United States*, 272 U.S. 52 (1926), and *Ex parte Hennen*, 38 U.S. 225 (1839)). The Court contrasted these officers with the Federal Election Commissioners and concluded that if the former were "inferior officers of the United States within the meaning of the Appointments Clause, as they are, surely the Commissioners before us are at the very least such 'inferior Officers' within the meaning of that Clause." *Id*.[8]

More fundamentally, treating discretion as necessary for the existence of an office conflicts with the original understanding of "office," early practice, and early precedents. The Constitution itself repeatedly refers to offices of "Trust" as a *subset* of offices. *See* U.S. Const. art. I, § 9, cl. 8 (Emoluments Clause); *id*. § 3, cl. 7 (judgments in cases of impeachment); *id*. art. II, § 1, cl. 2 (qualification for presidential electors). And an "office of trust" is "[a]n office whose duties and functions require the exercise of *discretion*, judgment, experience and skill." Mechem § 16, at 9 (emphasis added); *see Town of Meredith*, 2 N.H. at 519 (similar). Blackstone contrasted "offices of public trust" with "ministerial offices." 2 William Blackstone, *Commentaries* \*36–37. Early legal dictionaries and abridgments, drawing on *Burnell*, similarly explained that a public officer "is not the less a publick officer, where his authority is confined to narrow limits; because it is the duty of his office, and the nature of that duty, which makes him a publick officer, and not the extent of his authority." *E.g.*, Jacob, *tit.* Office. Mechem reaffirmed this point. Mechem § 9, at 7 (quoting *Burnell*, Carth. at 479). Thus, a ministerial office—one that "give[s] the officer no power to judge of the matter to be done, and require[s] him to obey the mandates of a superior"—was still a public office. *Bouvier* at 203; *see also* Jacob, *tit.* Office (referring to ministerial offices); Charles Viner, *A General Abridgment of Law and Equity* 110 (2d ed. 1791) (same); Mechem § 21, at 10 ("Ministerial officers are those whose duty it is to execute the mandates, lawfully issued, of their superiors.") (internal quotation marks omitted); *id*. § 657, at 441 (generally defining ministerial functions and officers).

Early congresses and administrations, perhaps remembering the experiences that had led to the Declaration of Independence's protest against British officers, confirmed this original meaning of an "office" through their jealousy of discretion, which they considered a threat to liberty in the hands of officers. Congress originally cabined the number of offices that possessed discretion, so that only the President and Cabinet officers would exercise substantial discretion, and most

---

[8] At the same time, the Court indicated that there may be positions whose duties are "in an area sufficiently removed from the administration and enforcement of the public law as to permit their being performed by persons not 'Officers of the United States.'" *Buckley*, 424 U.S. at 139; *see id*. at 141 (essentially same). As noted above, we have no occasion here to consider particular positions or what such duties or positions may be, apart from the historical examples we discuss of positions not involving delegated sovereign authority. *See also id*. at 126 n.162 (discussing distinction between officers and mere employees); Corwin, *President* at 91 & n.27 (same).

officers in the early Republic performed their sovereign functions within strict and narrow limits. *See* White, *The Federalists* at 448–59. The first federal marshals, for example, "were ministerial officers," required "'to execute . . . all lawful precepts' directed to them," and their instructions "dealt normally with a particular person or persons and required a specific action to be performed at the direction of a court." *Id*. at 455. Even within the early Treasury Department, where discretion in collectors of customs and the Comptroller could not be avoided, Secretary Alexander Hamilton pursued a system in which "little or nothing is left to the discretion of the officers of the revenue," *id*. at 448 (internal quotation marks omitted), and any necessary discretion was lodged "high in the official ranks," *id*. Thus, it was generally accepted that the "officers of the United States" included many particular officers who had authority but little if any discretion in administering the laws; these included officers such as registers of the land offices, masters and mates of revenue cutters, inspectors of customs, deputy collectors of customs, deputy postmasters, and district court clerks. *See* Roll of the Officers, Civil, Military, and Naval, of the United States, 1 *Am. St. Papers, Misc.* 260–319 (1802); *Hennen*, 38 U.S. at 257–58 (district court clerk); *United States v. Morse*, 27 F. Cas. 1 (C.C.D. Me. 1844) (No. 15,820) (Story, Circuit Justice) (inspector of customs); *United States v. Barton*, 24 F. Cas. 1025, 1027 (E.D. Pa. 1833) (No. 14,534) (deputy collector of customs); 3 Story § 1530, at 387 (court clerks and reporters; deputy postmasters). *See also* Pomeroy §§ 658–59, at 438–39 (1883 critique of spoils system objecting that "[t]he office holder sees that administration of the ministerial functions committed to him, is a thing of no comparative importance," and referring to "the great mass of ministerial officers, whose duties are not political").[9]

If it is not necessary to the existence of delegated sovereign authority (and thus to the existence of an office) that a position include the exercise of discretion, all the more is it not necessary that a position include some sort of "independent" discretion in carrying out sovereign functions. The question for purposes of this first element is simply whether a position possesses delegated sovereign authority to act in the first instance, whether or not that act may be subject to direction or review by superior officers: "[A] delegation of a portion of the sovereign power" involves "a legal power, which may be rightfully exercised, and in its effects it will bind the rights of others, and be subject to revision and correction only according to the standing laws of the State," in contrast with a person whose acts have no "authority and power of a public act or law" absent the "subsequent sanction" of an officer or the legislature. *Opinion of the Justices*, 3 Greenl. at 482;

---

[9] The term "ministerial" may, however, be used informally in a different sense to indicate that certain duties do not involve the exercise of delegated sovereign authority. *See Constitutional Limits on "Contracting Out,"* 14 Op. O.L.C. at 99 (quoted above in Part II.A.2).

*see also* White, *Federalists* at 448 ("Official acts may be either exactly prescribed or discretionary. Official authority is obviously enlarged by extension of discretionary power."). Again, early practice reinforces this understanding: Inferior revenue officers, for example, had the delegated sovereign authority to make classification decisions, but those decisions could be subjected to two layers of appeal, the second being the Treasury Secretary himself. *See id.* at 455; *see also, e.g.*, Act of May 28, 1796, ch. 37, §§ 3, 8 & 9, 1 Stat. 478, 479, 480–81. A revenue officer's decision could, without any "subsequent sanction," by law "bind the rights of others," even though by law readily "subject to revision and correction" on the initiative of the taxpayer.

### b. Contractors

Second, although it is true as a general matter that contractors do not hold an office under the United States, the reason for that (in most cases) is that they do not exercise any delegated sovereign authority. A person's status as an independent contractor does not per se provide an exemption from the Appointments Clause; rather, a typical contractor provides goods or services instead of possessing any executive or judicial authority. (Similar considerations apply to analysis of grantees.) As the Maine Supreme Judicial Court explained, a contractor merely provides "a species of service performed under the public authority and for the public good, but not in the execution of any standing laws, which are considered as the rules of action and the guardians of rights." *Opinion of the Justices*, 3 Greenl. at 482–83. That is why a contract with an agent for the preservation of timber on the public lands, like the employment of a "state printer, or a contractor to build a state house, or a state prison," did not constitute an office. *Id*. at 483. *See also Maurice*, 26 F. Cas. at 1214 ("A man may certainly be employed under a contract, express or implied, to do an act, or perform a service, without becoming an officer."); *Bache v. Binns*, 17 Serg. & Rawle 219, 220 (Pa. 1828) (printer of congressional reports "holds merely a contract . . . as printer of a newspaper, implying such trust only as is ordinarily implied in contracts for work"); *id*. at 221 (printer was "working for the United States government, as he would work for any other customer on contract for pay"). Similarly, the Supreme Court of the United States held, in *Hall v. Wisconsin*, 103 U.S. 5 (1880), that "commissioners" hired to conduct a survey were contractors rather than officeholders (and therefore were protected by the Constitution's Contract Clause, art. I, § 10, cl. 1); the Court compared them to parties who contract "for the erection, alteration, or repair of public buildings, or to supply the officers or employees who occupy them with fuel, light, stationery, and other things necessary for the public service." *Id*. at 10. The commissioners lacked any "portion of the sovereignty" or "the enforcement of municipal regulations or the control of the general interests of society." *See id*. at 9. And in *United States v. Germaine*, 99 U.S. 508 (1878), the Court scoffed at the notion that "a law requiring the commissioner [of Pensions] to appoint a man

to furnish each agency with fuel at a price per ton fixed by law high enough to secure the delivery of the coal" would create an office. *Id*. at 512; *see Auffmordt v. Hedden*, 137 U.S. 310, 328 (1890) (same).

Many members of Congress took the same view in an early debate. Representative John Randolph proposed in 1806 a resolution providing, among other things, that "a contractor under the Government of the United States is an officer within the purview and meaning of the Constitution, and, as such, is incapable of holding a seat in this House" pursuant to the Incompatibility Clause. 15 Annals of Cong. 880 (1852) (reprinting the 1806 resolution); *see generally* David P. Currie, *The Constitution in Congress: The Jeffersonians, 1801–1829*, at 82–85 (2001) (discussing the resolution and debate). The House of Representatives overwhelmingly rejected the resolution, and many who spoke against it explained that, under the accepted definition of an "office," a contractor was not an officer because he possessed no governmental power. As Representative Eppes observed:

> An extensive meaning has been given to the word "office." . . . That all contractors are not officers, I am certain. A man, for instance, makes a contract with the Government to furnish supplies. He is certainly not an officer, according to the common and known acceptation of that word. He is, however, a contractor, and, under this resolution, excluded from a seat here. A carrier of mail approaches very near an officer. The person takes an oath, is subject to penalties, the remission of which depend on the Executive. His duties are fixed and prescribed by law. Near, however, as this species of contract approaches to an office, I do not consider that the word "office" in the Constitution can include even this species of contract. I consider the word "office" in the Constitution ought to be construed according to the usual import and meaning of that term.

15 Annals of Cong. at 883. Representative Findley likewise argued that a contractor who "furnished the public with [an] article of supply," such as "flour for the use of the army" or "paper and quills" for the House, did not hold an office because "*it was an essential attribute of office for a man to possess some power, to be exercised on behalf of the Government. Now a mere contractor receives no such power*; he only enters into an engagement[] to perform certain specified duties." Under Randolph's view, "Every man who sold anything to the Government must . . . be considered as an officer," which was absurd. *Id*. at 885. Representative Kelly also concurred: "A contractor receives no authority from Government." *Id.* at 890–91; *see also id.* at 887 (Rep. Nelson) (persons with whom the Postmaster General contracts to carry the mail "are not officers of the United States, they are mere hirelings"); *id*. at 888 (Rep. Bidwell) ("To say that a contractor is an officer is giving a new signification to the words contractor or officer."); *id.* at 890 (Rep. Elmer) ("Both common sense and the Constitution

forbade considering a contract in the light of an office, and he had never before heard of it contended that they were equivalent terms.").

A related reason that contractors in most cases do not hold an office is that, to the extent they do assist the government in carrying out its sovereign functions, their actions (unlike those of the subordinate officers just discussed with regard to discretion) have no legal effect on third parties or the government absent subsequent sanction. They do not actually have delegated sovereign authority, even if they assist those who do or must comply with applicable law in carrying out the contract; rather, their advisory and other assisting actions are a kind of service. As the Maine Supreme Judicial Court explained: "An employment merely has none of these distinguishing features" of an office—namely "delegation of the sovereign power." Rather, "[a] public agent acts only on behalf of his principal, the public, whose sanction is generally considered as necessary to give the acts performed the authority and power of a public act or law." *Opinion of the Justices*, 3 Greenl. at 482. The mere authority to advise or inform is not delegated sovereign authority. *See*, *e.g.*, *Buckley*, 424 U.S. at 138; *Emoluments Clause*, 29 Op. O.L.C. at 63–70. Even at the time of its broadest prior reading of the Appointments Clause, this Office recognized that "advisory, investigative, informative, or ceremonial functions" are not subject to the Clause. *Legislative Encroachments*, 13 Op. O.L.C. at 249. More recently, we explained that the President may, without creating any issue under the Appointments Clause, "tap advisers . . . to work on his behalf," grant them substantial practical authority to develop and coordinate policy among federal agencies, and even formalize the arrangement in an executive order, so long as he does not purport to grant such advisers any "*legal* power" over an agency or otherwise "disturb the statutory allocation of authorities." *Centralizing Border Control Policy Under the Supervision of the Attorney General*, 26 Op. O.L.C. 22, 26, 27 (2002) (emphasis added).

Conversely, in those rare cases where a mere contractor *did* exercise delegated sovereign authority (and did so on a continuing basis), he did hold an office subject to the Appointments Clause. *See Maurice*, 26 F. Cas. at 1216–20; *cf. Holdover and Removal of Members of Amtrak's Reform Board*, 27 Op. O.L.C. 163, 166–68 (2003) (holding that, as an incident of his statutory power to appoint the board members of a federally created corporation, the President had power to remove them at will, notwithstanding statutory provision that the corporation was not a department, agency, or instrumentality of the government). As the Attorney General explained nearly ninety years ago, "the inquiry must always be into the nature of the service to be rendered. If the appointee himself performs any of the functions of government, he is an officer. If he merely renders assistance to another in the performance of those functions, he is an employee." *Employee's Compensation Act*, 31 Op. Att'y Gen. 201, 203–04 (1918).

### c. State Officers

Finally, state officers ordinarily do not possess delegated sovereign authority of the federal government, even when they assist in the administration of federal law. Thus, the Appointments Clause ordinarily does not apply to them. State officers, even when enforcing federal law, generally exercise the sovereign law enforcement authority of their state, ultimately delegated by the people of that state; if they hold any office, they are officers of their state or locality, not of the United States. They hold authority independently of a delegation from the federal government, and they and those who appoint them are accountable for their actions to the people of the state.

States and their officers stand in a unique relationship with the federal government and the people under our constitutional system of dual sovereignty. As the Tenth Amendment makes express, the Framers "designed a system in which the State and Federal Governments would exercise concurrent authority over the people." *Printz*, 521 U.S. at 919–20; *see* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 801 (1995) ("The 'plan of the convention' . . . draws a basic distinction between the powers of the newly created Federal Government and the powers retained by the pre-existing sovereign States."). The states thus retain inherent sovereign authority within their jurisdictions, and their powers proceed "not from the people of America, but from the people of the several States; and remain, after the adoption of the constitution, what they were before, except so far as they may be abridged by that instrument." *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 193 (1819); *accord The Federalist* No. 32, at 200 (Hamilton) ("[T]he State Governments would clearly retain all the rights of sovereignty which they before had and which were not by [the Constitution] *exclusively* delegated to the United States."). Recognizing this concurrent authority, the Constitution binds state officers, along with federal ones, to swear to support the Constitution. U.S. Const. art. VI, cl. 3.

That retained power includes, if a state wishes, some authority to enforce federal law within the state's jurisdiction, subject to any limits imposed by the Constitution (apart from the Appointments Clause) or by federal law. *See generally* Currie, *Jeffersonians* at 78 ("the Union may do only what the Constitution permits and the states may do whatever it does not forbid," although "there are implicit constitutional limitations on state power to interfere with federal operations"); *cf. supra* note 1. Indeed, the Founders assumed that "the States would consent to allowing their officials to assist the Federal Government." *Printz*, 521 U.S. at 911. Madison, for example, predicted that "the eventual collection [of internal revenue] under the immediate authority of the Union, will generally be made by the officers, and according to the rules, appointed by the several States," and found it "extremely

probable that in other instances, particularly in the organisation of the judicial power, the officers of the States will be cloathed with the correspondent authority of the Union." *The Federalist* No. 45, at 313; *see Printz*, 521 U.S. at 910 (cataloguing other such statements). The early federal government did indeed make provision for such action by state officials. *See, e.g.*, Act of March 26, 1790, § 1, ch. 3, 1 Stat. 103 (state judicial officers' duties involving naturalization); Act of June 18, 1798, §§ 2, 4, ch. 54, 1 Stat. 566, 567–68 (same); Act of April 14, 1802, § 1, ch. 28, 2 Stat. 153, 153–54 (same); Act of July 20, 1790, ch. 29, 1 Stat. 131 (proceedings involving merchant ships); Act of Apr. 7, 1798, ch. 26, 1 Stat. 547 (proceedings involving land claims by refugees); Act of July 6, 1798, ch. 66, 1 Stat. 577, 577–78 (proceedings involving claims against aliens). And in *Houston v. Moore*, 18 U.S. (5 Wheat.) 1 (1820), the Court upheld Pennsylvania's power to try a militiaman under federal criminal law for failing to report for federal service. Similarly, this Office has found it "well-settled that state law enforcement officers are permitted to enforce federal statutes where such enforcement activities do not impair federal regulatory interests." *Assistance by State and Local Police in Apprehending Illegal Aliens*, 20 Op. O.L.C. 26, 29 (1996); *see also United States v. Di Re*, 332 U.S. 581, 589 (1948) (looking to state law to determine validity of arrest without warrant for federal offense); *cf. Separation of Powers*, 20 Op. O.L.C. at 146 n.63 ("Where state officials do exercise significant authority under or with respect to federal law, they do so *as state officials*, by the decision and under the ultimate authority of the state.").[10]

### B. The Position Must Be "Continuing"

The second element of a federal "office," necessary to make a position subject to the Appointments Clause, is that the position be "continuing." As explained below, a position is most clearly of this sort where it is permanent. But a temporary position also may be continuing, if it is not personal, "transient," or "incidental." Like the first element, this second one emerges from the Constitution's text, extensive early authority (including, after the Civil War, leading decisions of the Supreme Court), and the law of public offices. After setting out the authority for this element, we describe its contours and then apply it to a few recurring areas.

---

[10] If, however, a state officer enforcing federal law depended on affirmative *federal* authorization—as opposed to state authorization (subject to any federal limits or regulations) or a mere federal removal of a disability (such as preemption)—the constitutional analysis would differ, as suggested by the divisions in the early case of *Pool* discussed above. *See supra* note 6. At the extreme, Congress may not "*direct* state law enforcement officers to participate . . . in the administration of a federally enacted regulatory scheme," *Printz*, 521 U.S. at 904 (emphasis added), or "impress[] state police officers into federal service," *id*. at 923 n.12, in part because of the Appointments Clause, *id*. at 922–23.

### 1. The Foundations of This Element

The Constitution refers to an office as something that one "holds" and "enjoys" and in which one "continues," and these descriptions suggest that an office has some duration and ongoing duties. *See*, *e.g.*, U.S. Const. art. I, § 3, cl. 7 (impeachment leading to "disqualification to hold and enjoy any Office"); art. I, § 6, cl. 2 (Incompatibility Clause, referring to a "Person holding any Office" and having a "Continuance in Office"); art. I, § 9, cl. 8 (Emoluments Clause, referring to a "Person holding any Office"); art. II, § 1, cl. 2 (providing that no "Person holding an Office . . . shall be appointed an Elector"). Similarly, the Recess Appointments Clause suggests that an office is a position that may be vacant (thus not held only by a single person) and will continue beyond a single session of Congress. *See id*. art. II, § 2, cl. 3 ("The President shall have Power to fill up all Vacancies that may happen during the recess of the Senate, by granting Commissions which shall expire at the End of their next Session."). And the Appointments Clause itself indicates that most offices are "*established* by Law." *Id*. cl. 2 (emphasis added). One aspect of an office's duration is its tenure, the period during which a particular incumbent may hold, enjoy, and continue in the office, and the tenure also establishes that the existence of the office is not contingent on a particular person's holding it. The Constitution expressly mentions permanent, non-personal offices that may be held for a term, such as President or Vice President, *see id.* art. II, § 1, and others that may be held during good behavior, namely judgeships, *see id.* art. III, § 1. Madison during ratification listed three possible tenures: He referred to "persons holding their offices during pleasure, for a limited period, or during good behavior." *The Federalist* No. 39, at 251; *see also* Rehnquist Letter at 3 ("The analysis does not rest simply on the fact that the incumbent lacks fixed tenure; such is true of Cabinet members . . . . But the position itself, as a position and apart from the particular incumbent, has no fixed duration.").[11]

---

[11] The permissibility under the Appointments Clause of assigning a person to carry out the duties of an office temporarily (on an acting basis) is distinct from, albeit related to, whether an office exists. The former question can be understood as whether, if an office exists, a person exercising its duties truly "holds" it. *See United States v. Eaton*, 169 U.S. 331, 343 (1898) (upholding designation of vice consul to act as consul: "Because the subordinate officer is charged with the performance of the duty of the superior *for a limited time and under special and temporary conditions*, he is not thereby *transformed into* the superior and permanent official") (emphases added); U.S. Const. art. II, § 1, cl. 6 (providing that in cases of removal, death, resignation, or inability of the President, "the Powers and Duties of the said Office . . . shall devolve on the Vice President," and authorizing Congress by law to declare, for cases of removal, death, resignation, or inability of both the President and Vice President, "what Officer shall then *act as* President, and such Officer shall act accordingly, *until the Disability be removed, or a President shall be elected*") (emphases added), *amended by id*. amend. XXV (providing that in cases of removal, death, or resignation of the President, the Vice President "shall become

The same meaning of an "office" finds support in the legal dictionaries contemporaneous with the Founding. They distinguished between short-term arrangements, such as an "agreement to make hay, plough land, herd a flock, &c.," and continuing positions, such as "steward of a manor," that qualified as public or private offices. Jacob, *tit.* Office; *see* Cunningham, *tit.* Office (same). Even the early case of *Burnell* suggests the distinction, in the defendant's attempt to portray his position as not an office because it merely involved "particular Powers created for particular Purposes." Carth. at 479. By the time of the Founding, an "office" was understood in the common law "as an *institution* distinct from the person holding it and capable of persisting beyond his incumbency," to which "certain frequently recurrent and naturally coherent duties [were] assigned more or less permanently." Corwin, *President* at 85.

Early American practice and precedent, particularly with regard to diplomacy (the conduct of which, as explained above in Part II.A.2, can include delegated sovereign authority), strongly support and illuminate this understanding that, to be an office, a position must have continuance or duration. From the beginning, Presidents repeatedly have "dispatched 'secret' agents on diplomatic or semidiplomatic missions without nominating them to the Senate." Corwin, *President* at 86. One of President Washington's first acts was unilaterally to name Gouverneur Morris (a fellow delegate to the Constitutional Convention) as a special agent to explore a commercial treaty with Britain. David P. Currie, *The Constitution in Congress: The Federalist Period: 1789–1801*, at 44 (1997). Washington also unilaterally named "commissioners" to deal with a rebellion in Pennsylvania in 1794 without appointing them officers. *See* Corwin, *President* at 406 n.7. So too have Presidents as far back as Washington "designated members of . . . [Congress] to represent the United States on international commissions and at diplomatic conferences," *id*. at 86, notwithstanding that the Constitution's Ineligibility Clause may have barred the members' appointment to a "civil Office under the Authority of the United States" and that the Incompatibility Clause would have required them to vacate their seats in Congress if they took "any Office under the United States." U.S. Const. art. I, § 6, cl. 2; *see*, *e.g.*, *Member of Congress—Appointment to Office*, 21 Op. Att'y Gen. 211, 214 (1895) (finding violation of Ineligibility Clause in appointment of senator, because during his senatorial term "the emoluments of the office of minister to Mexico were increased"). In a striking early illustration, President Jefferson appointed Senator Daniel Smith as a commissioner to negotiate and execute treaties with the Cherokee Indians, yet Jefferson did not submit the nomination to the Senate, and Smith did not vacate his seat in the Senate. *See* 1 *Am. St. Papers, Indian Affairs* 697–98 (1805). Absent contempora-

President" but that in cases of inability the Vice President shall discharge the powers and duties of the office of President "as Acting President").

neous objections on constitutional grounds to such early and consistent practice, we presume that it reflects an early consensus of its constitutionality. The rationale for this consensus, evident from the early understanding of an "office," is that "such diplomatic assignments are not 'offices' in the sense of the Constitution, being summoned into existence only for *specific temporary purposes*." Corwin, *President* at 86 (emphasis added). Indeed, a House select committee in 1822 found no "office as was contemplated by the Constitution" in President Jefferson's dispatching of Senator Smith, also noting a similar example from Madison's administration. 39 Annals of Cong. 1407, 1409–10 (1855); *see also Office—Compensation*, 22 Op. Att'y Gen. 184, 188–89 (1898) (noting other appointments for "special work of great international importance").

The most prominent early example is the Jay Treaty of 1794. It established tribunals for resolving both a border dispute and claims between creditors and merchants of the United States and Great Britain. The tribunals' commissioners were to be appointed in equal numbers by the President (with the advice and consent of the Senate) and the British King, with a final commissioner chosen by lot. *See* Treaty of Amity, Commerce and Navigation, U.S.-Gr. Brit., Nov. 19, 1794, arts. V & VI, 8 Stat. 116, 119–21 (1794); *see also* 1 *Journal of the Executive Proceedings of the Senate* 204–05 (Apr. 1, 1796) (1828) (confirmation of commissioners). The treaty's opponents, perhaps spurred by its requirement of Senate confirmation, objected that the Appointments Clause prohibited creation of commissioners by treaty. Hamilton responded in a series of essays defending the treaty:

> [They] are not in a strict sense OFFICERS. They are *arbitrators* between the two Countries. Though in the Constitutions, both of the U States and of most of the Individual states, a particular mode of appointing officers is designated, yet in practice it has not been deemed a violation of the provision to appoint *Commissioners or special Agents for special purposes* in a different mode.

Alexander Hamilton, *The Defence* No. 37 (Jan. 6, 1796), *reprinted in* 20 *The Papers of Alexander Hamilton* 13, 20 (Harold C. Syrett ed., 1974) (second emphasis added); *see Separation of Powers*, 20 Op. O.L.C. at 146 n.67 (quoting this passage as primary example of the "long historical pedigree" for the argument that United States representatives to multinational or international entities "need not be appointed in accordance with Article II" where the entities "are created on an ad hoc or temporary basis").[12]

---

[12] The objection, as stated by Hamilton, was that "[t]he constitution is said to be violated in that part, which requires the establishment of Officers of the U. States by law—by those stipulations of the Treaty which without the intervention of law provide for the appointment of Commissioners." 20

A century later, Attorney General Griggs twice applied the same understanding of an office to "special Agents for special purposes." In 1898, he opined that a commissioner appointed by the President pursuant to a treaty, to arbitrate certain claims between the United States and Great Britain arising from the seizure of British vessels in the Bering Sea, did not hold an "office" under a particular statute, because "the *temporary character* of the employment, which was to consist of and to terminate at the end of the examination of *a limited number of specified claims*, withdraws one of the elements of an office which the Supreme Court regards as essential." *Office—Compensation*, 22 Op. Att'y Gen. at 188 (citing *Auffmordt*, 137 U.S. at 327) (emphases added); *see id*. at 187 (commissioner is "sent to adjudicate upon certain named claims, listed at the end of the treaty," and his "employment was thus to perform a certain task which might take a month or several months"); *id*. at 188 (referring to "occasional and temporary commissionerships"). Then in *Members of the General Board of Arbitration*, 23 Op. Att'y Gen. 313 (1900), the Attorney General reaffirmed his 1898 opinion and found it constitutional for the President alone to appoint, pursuant to a treaty, persons to a list from which panels of arbitrators could be drawn to resolve future disputes between signatory nations. (Attorney General Griggs was himself one of the first so named, in 1901.) Those on the list would not be "in the ordinary acceptation of the term, persons holding office," because they would have no ongoing duties or authority: "Nominally they may be appointed for six years, but they may never actually exercise any functions at all. Their work is not only occasional, but contingent upon what is practically an appointment to act as arbitrators, to be received from foreign powers in the future." *Id*. at 315.[13] *Cf. British and American*

---

*Papers of Alexander Hamilton* at 14; *see* Cato, *Observations on Mr. Jay's Treaty* No. XIII, *in* 1 *The American Remembrancer* 244, 250–51 (1795) (arguing that offices not enumerated in Appointments Clause may only be established by law, which did not include treaty; adding, "By what authority, then, can Mr. Jay and Lord Grenville, or the president and the senate, over-ride the constitution, and assume a power to control the rights of congress, to create the office, and to place it in such hands as they think proper, under the above limitations?"); *id*. No. XIV, *in* 2 *The American Remembrancer* 3, 3 (1795) ("No power is vested in [Congress] to allow the appointment of any officer by *lot*, and much less to admit that his Britannic majesty should exercise the right of appointing judges for the trial of causes in which they are themselves to be the parties."). Hamilton answered the objection indirectly—by denying that any offices were being created. An 1802 "Roll of Civil, Military, and Naval Officers," tracking expenses, includes the salaries of the American commissioners, "as they were appointed by the President," and also includes the U.S. contribution of half the salary of the jointly appointed commissioner, but notes that the "commission is not now in a state of activity." 1 *Am. St. Papers, Misc.* at 307 n.*.

[13] An alternative ground for Griggs's 1900 conclusion was that the listed arbitrators, even if called to serve, "are not expected to exercise any part of the sovereignty of the United States; they are not expected to perform any functions in the Government of the United States." Rather, they would serve "two foreign nations that may select them and authorize them to settle a dispute between two nations." *Members of the General Board of Arbitration*, 23 Op. Att'y Gen. at 315; *cf. Office—Compensation*, 22 Op. Att'y Gen. at 188 ("a person employed solely as a sworn judge of a joint international commission would not be spoken of as an officer of either country, although, under a treaty requiring it, selected

*International Commissioners*, 6 Op. Att'y Gen. 65 (1853) (addressing questions regarding payment of commissioners appointed to arbitrate claims between Great Britain and American citizens pursuant to a treaty, without suggesting any constitutional issues).

This second element of an "office" is also well established by the early law of public offices. In *Maurice*, Chief Justice Marshall concluded that the office of "agent of fortifications" existed in the Army. He explained that "if a duty be a continuing one" and "if those duties continue, though the person be changed; it seems very difficult to distinguish such a charge or employment from an office, or the person who performs the duties from an officer." 26 F. Cas. at 1214. Forty years later, the Illinois Supreme Court in *Bunn* used *Maurice* as the benchmark and reasoned that Marshall would have found no office if the agent had "been appointed merely to superintend the erection of a single fortification, his duties ceasing when the work was accomplished"; the court found no office in a position—commissioner to build the state house—involving "one single special duty," "not of a permanent, but of a transient and incidental character." 45 Ill. at 404–05. Similarly, the court in *Pool*, *see supra* note 6, essentially held that a state justice of the peace, allowed by federal law to commit to jail for trial any deserting seaman, was not a judicial officer of the United States, because he was not exercising the "regular and permanent duties" of a federal court but rather handling "incidental and occasional matters," 2 Va. Cas. at 280; the dissent claimed a violation of the Appointments Clause by focusing only on delegated authority, quoting *Burnell* and objecting that the "important duties" of enforcing federal criminal laws should not be entrusted to "mere agents," or "persons negotiating occasional business." *Id*. at 288 (Semple, J., dissenting).

Earlier, the Supreme Court of Pennsylvania in *Shepard v. Commonwealth*, 1 Serg. & Rawle 1 (Pa. 1814), held (in the alternative) that a commissioner, paid by the day for issuing binding decisions regarding certain claims to, and compensation for, certain lands in a particular county, did not hold an office of profit under the state constitution, because the position was "rather the execution of a special commission, than the holding of an office." *Id*. at 10. The same court also held that a person appointed as a city's port physician, a post with a statutory duration of four years, did not hold an office subject to the state constitution's appointments

---

and sent to his post by one of them"). In both decisions, Griggs also addressed the relationship between the treaty power and the Appointments Clause, the question that Hamilton had avoided. *See* 22 Op. Att'y. Gen. at 185–87; 23 Op. Att'y Gen. at 315. But whether it is constitutional for a treaty, as opposed to a law, to establish an office under the United States or, conversely, whether a position created by treaty is not such an office because not created by law (even if otherwise having the characteristics of such an office), or may not be for some other reason, is beyond the scope of this opinion. *See generally infra* Part II.C.2 (discussing creation of offices "by law"). In both cases, it was otherwise clear that the positions did not have the characteristics of offices of the United States.

clause. *Commonwealth v. Sutherland*, 3 Serg. & Rawle 145 (Pa. 1817). The Chief Justice explained that "there are matters of temporary and local concern, which, although comprehended in the term *office*, have not been thought to be embraced by the constitution." *Id*. at 9. Other early cases are to like effect. *See In re Oaths*, 20 Johns. 492, 493 (N.Y. 1823) (dicta, stating that "office" requires a public employment "not merely transient, occasional or incidental"); *Kennon*, 7 Ohio St. at 559, 562 (declining to decide "[h]ow far the general assembly may go in constituting temporary agencies and commissions for temporary, incidental, transient, or occasional purposes" without "creating an office," where positions at issue "exercise continuously, and as a part of the regular and permanent administration of the government, important public powers, trusts, and duties"); *Shelby*, 36 Miss. at 289 (declaring it "universally true, that where an employment or duty is a continuing one, which is defined by rules prescribed by law and not by contract, such a charge or employment is an office"); *cf. Barton*, 24 F. Cas. at 1027 (contrasting positions of temporary deputy collector, appointed by collector in cases of his "occasional and necessary absence, or [] sickness," and the "permanent office" of deputy collector, appointed by Secretary of the Treasury); *Boyd*, 1 Pin. at 363 ("An office is where, *for the time being*, a portion of the sovereignty, legislative, executive or judicial, attaches, to be exercised for the public benefit.") (emphasis added).

The Attorneys General as well held the same understanding in the domestic context from an early date. An 1828 opinion concluded that a statute granting the Commandant of the Marine Corps authority to appoint officers when "it shall become necessary" did not violate the Appointments Clause so long as it was interpreted to permit only "an occasional and transitory appointment" in emergency circumstances "should [the Marines] be detached from the ships to which they belonged." *Authority of Lieutenant Colonel Commandant of Marine Corps*, 2 Op. Att'y Gen. 77, 78–79 (1828). In 1843, Attorney General Legare determined that "permanent inspectors" of customs were "officers of the government of the United States," required to be appointed consistent with the Appointments Clause, while "occasional inspectors whose services were demanded in extraordinary exigencies in the service" were not. *Appointment and Removal of Inspectors of Customs*, 4 Op. Att'y Gen. at 163; *see also Contract With Architect of Public Buildings*, 5 Op. Att'y Gen. 754, 754–55 (1823) (appendix) (contrasting "offices of a permanent nature" with a position involving a "subject-matter . . . of a temporary and limited character," properly characterized as a contract); *The Reconstruction Acts*, 12 Op. Att'y Gen. 141, 155–56 (1867) (relying on *Sutherland* and invoking the "well established" rule that "persons who exercise special public duties rather in the nature of occasional employments than general and continuing official duty" are not properly considered executive or judicial officers of a state); *cf. Mandatory Statutes—Appointing Power*, 8 Op. Att'y Gen. 41, 44 (1856) ("I can conceive the possibility of a provision of law by which a controversy between the Government

and the city of Baltimore shall be submitted to two arbitrators, one to be appointed by each party, and in case of disagreement, they to select an umpire."). And the 1822 House report, noted above in connection with diplomatic assignments, was ultimately concerned with whether the temporary assignment of a senator to "examine various land offices of the United States" (that is, to audit their books), for which he was paid by the day, made him an officer under the Ineligibility and Incompatibility Clauses. The committee concluded that it did not. 39 Annals of Cong. at 1408–10; *see also id*. at 1410–13 (collecting additional examples). The committee observed that this "opinion seems to have received the sanction, and regulated the practice, of the Government since the adoption of the Constitution, by those who bore a principal share in composing it; and must, therefore, be supposed to have understood its real import." *Id.* at 1409.

In a series of cases after the Civil War, the Supreme Court adhered to and applied this longstanding understanding. In *Hartwell* (1868), the Court held that "a clerk" in the office of the "assistant treasurer of the United States . . . at Boston" was a "public officer[]" for purposes of an indictment under an embezzlement statute. The Court explained:

> An office is a public station, or employment, conferred by the appointment of government. The term embraces the ideas of tenure, duration, emolument, and duties.

> The employment of the defendant was in the public service of the United States. He was appointed pursuant to law, and his compensation was fixed by law. Vacating the office of his superior would not have affected the tenure of his place. His duties were continuing and permanent, not occasional or temporary. They were to be such as his superior in office should prescribe.

73 U.S. (6 Wall.) at 393. *Hartwell* considers, among other things, whether a position's duties have "duration," meaning that they are "continuing and permanent" rather than "occasional or temporary," and whether the position has "tenure." The term "tenure" refers to the ability of an incumbent to hold a position for a period of time, not contingent on any particular person, as Madison indicated in *Federalist* No. 39, quoted above. *See also Hennen*, 38 U.S. at 259 ("All offices, the tenure of which is not fixed by the Constitution, or limited by law, must be held either during good behavior, or . . . during the life of the incumbent; or must be held at the will and discretion of some department."); *Tenure of Office of Inspectors of Customs*, 2 Op. Att'y Gen. 410, 412 (1831) ("When an office is held during the pleasure of any designated officer, it is at the pleasure of the *officer*, and not of the *individual*."). The Attorney General has explained the connection between "tenure" and this second element of an "office" as follows: "By *tenure* is not meant a holding for a fixed term. . . . The distinction is between those persons

whose services are occasional and temporary, fixed by some contract of employment, and those whose services are general and indefinite in a line of duty prescribed by law. . . . A deputy clerk has an indefinite tenure given him by law." *Deputy Clerks of United States District Courts—Premium on Official Bonds*, 29 Op. Att'y Gen. 593, 595–96 (1912).

The Court applied *Hartwell* in *Germaine* (1879) to hold unanimously that a civil surgeon appointed by the Commissioner of Pensions to examine pensioners and applicants for pensions, and paid per examination, was not an "officer of the United States" for purposes of a criminal statute because his "duties are *not* continuing and permanent, and they *are* occasional and intermittent." 99 U.S. at 512. The Court explained that "[t]he surgeon is only to act when called on by the Commissioner of Pensions in some special case, as when some pensioner or claimant of a pension presents himself for examination." *Id.*[14]

In *Auffmordt* (1890), the Court applied these two statutory decisions to the Appointments Clause, while also relying on *Maurice*. Under a customs statute, if an importer demanded a reappraisal of the valuation of his goods, the collector of customs was to select a "discreet and experienced merchant" as at least one of two people to do the reappraisal. If the two agreed, the decision was final. 137 U.S. at 312. The Court, again unanimously, held that such merchant appraiser need not be appointed in accordance with the Appointments Clause, because he did not hold an office:

> The merchant appraiser is an expert, *selected as an emergency arises*. . . . He is selected for the special case. *He has no general functions, nor any employment which has any duration as to time, or which extends over any case further than as he is selected to act in that particular case.* He is an executive agent, as an expert assistant to aid in ascertaining the value of the goods, selected for the particular case on the request of the importer, and selected for his special knowledge in regard to the character and value of the particular goods in question. He has no claim or right to be designated, or to act except as he may be designated. . . . His position is without tenure,

---

[14] President Cleveland in 1886 demonstrated the same understanding of an office when recommending to Congress a means to resolve labor disputes. He suggested that "instead of *arbitrators* chosen in the heat of conflicting claims, and after each dispute shall arise, for the purpose of determining the same, there be created a commission of labor, consisting of three members, who shall be *regular officers* of the Government, charged among other duties with the consideration and settlement, when possible, of all controversies between labor and capital." Letter to the Senate and House of Representatives (Apr. 22, 1886), *in* 11 *A Compilation of the Messages and Papers of the Presidents* 4979, 4980 (James D. Richardson ed., 1897) (emphases added). This commission "would have the advantage of being a stable body," gaining experience and ability, unlike "arbitrators . . . chosen for temporary service." *Id.* at 4980, 4981.

duration, continuing emolument, or continuous duties, and he acts only occasionally and temporarily. Therefore, he is not an 'officer,' within the meaning of the [Appointments Clause].

*Id.* at 326–27 (emphases added). As already suggested above in Part II.A.1, although the question of continuance was not at issue, the Court in *Buckley* did favorably cite *Auffmordt* and thus at least implicitly endorsed its analysis, such that one can consider the element of continuance incorporated in the Court's references to "significant authority." *See* 424 U.S. at 126 & n.162.

In the same year as *Auffmordt*, Mechem (discussed above in Part II.A.1 regarding delegated sovereign authority) also recognized this element. Relying particularly on *Maurice*, *Bunn*, and *Hartwell*, he wrote that "[d]uration or [c]ontinuance" is a criterion, Mechem § 8, at 6 (font altered), and explained that "[t]he term office . . . embraces the idea of tenure and duration, and certainly a position which is merely temporary and local cannot ordinarily be considered an office," *id.*; *see id.* at 6–7 n.7 & 7 n.1; *see also id.* § 1, at 2 (an office is sovereign power invested in an individual "for a given period, either fixed by law or enduring at the pleasure of the creating power"). Mechem nevertheless declared that "this element of continuance can not be considered as indispensable . . . if the other elements are present," *id.* § 8, at 7, relying primarily on a broad definition of "office" in dicta in *State v. Stanley*, 66 N.C. 59, 63 (1872). He also cited *Commonwealth v. Evans*, 74 Pa. 124 (1874), in which the court adopted a broad rule of statutory interpretation to reach all persons entrusted by law with collecting money due to the public, regardless of whether a person's service "be special or general, transient or permanent," even while recognizing that, under such a rule, it could be "a difficult matter to distinguish between a public officer and a person employed by the government to perform some special service by contract." *Id.* at 139.[15]

Other authority from the post-Civil War period likewise could be read to reject the necessity of continuance. First, both the Attorney General and the Supreme Court of Rhode Island concluded that a commissioner of the United States Centennial Commission held an office under the Constitution. The unpaid commission, appointed by the President, had been created by Congress in 1871 and was to continue "until the close of" the 1876 centennial exhibition. *See In re Corliss*, 11 R.I. 638, 640, 642 (1876). The Attorney General, briefly addressing the Emoluments Clause, "entertain[ed] no doubt that, *though their duties are of a*

---

[15] Mechem also cited *Vaughn v. English*, 8 Cal. 39 (1857). Although the court did not expressly mention the need for continuance, it also did not (unlike *Stanley* and *Evans*) disclaim it, and the position at issue (clerk in a department of the state) appears to have had continuous, indefinite duties with a clearly defined tenure. *See id.* at 42; *see also id.* at 41 (argument of prevailing party). *Vaughn* merely established that an office could have its tenure defined by reference to that of a superior office. *See Patton v. Bd. of Health*, 59 P. 702, 705 (Cal. 1899).

*special and temporary character*, they may properly be called officers of the United States during the continuance of their official functions." *Offices of Trust*, 15 Op. Att'y Gen. 187, 188 (1877) (emphasis added). He reasoned that "[t]he Government being interested in the performance of the[ir] duties, they constitute a public charge or office." *Id*. The court in *Corliss* answered the question under the disqualification rules for presidential electors. *See* U.S. Const. art. II, § 1, cl. 2. The court likewise pointed to the importance of the high-profile international exhibition, and noted that the commission received a federal appropriation (to be repaid from any profits) and the charge of some federal property. *See* 11 R.I. at 641–43. As far as we have determined, neither *Corliss* nor the Attorney General's opinion has been called into question on this issue. *See* 1 *Hinds' Precedents* at 609 (1898 report endorsing holding of *Corliss*).

Second, it was the uniform view of the federal courts in this period that a receiver of an insolvent national bank, appointed (ultimately) by the Secretary of the Treasury, was an officer for purposes of a statute authorizing certain suits in federal court by "the United States or any officer thereof." *Platt v. Beach*, 19 F. Cas. 836, 840 (E.D.N.Y. 1868); *Stanton v. Wilkeson*, 22 F. Cas. 1074, 1075 (S.D.N.Y. 1876); *Frelinghuysen v. Baldwin*, 12 F. 395, 396–97 (D.N.J. 1882); *Price v. Abbott*, 17 F. 506, 507–08 (C.C.D. Mass. 1883) (Gray, Circuit Justice); *United States v. Weitzel*, 246 U.S. 533, 541 (1918). A receiver had statutory authority to bring suit, through a U.S. Attorney and under the direction of the Solicitor of the Treasury, "to take possession of all the property, books, and records of the bank, and to collect all debts due to it"; "upon [a court] order . . . to sell or compound bad or doubtful debts, and to sell all the . . . property of the bank"; and to hold the bank's stockholders liable if necessary to pay the bank's debts. *See Price*, 17 F. at 507; *Platt*, 19 F. Cas. at 841. In the first such case, *Platt*, the district court did not respond to the defendant's argument from *Maurice* and *Shelby* that the position of a receiver was "occasional or transitory, depending upon fluctuations and exigencies," appointed to "perform a specific duty," upon the completion of which "his agency or service ceases," *id*. at 837; *see id*. ("there is no office of receiver of national banks established by law"); *id*. at 840 (an office requires a "continuing" duty). The plaintiff had responded that a receiver "comes within every word of [*Maurice*'s] definition. His duties continue . . . and they would continue though the person of the receiver should be changed." *Id*. at 839. *Stanton* was the only case to address the question of continuance. Judge Blatchford (later the author of *Auffmordt*) summarized *Hartwell* and simply stated: "A receiver of a national bank is in the public service of the United States. He is

appointed pursuant to law. Vacation of office by the comptroller does not vacate the receivership. His duties are continuing and permanent." 22 F. Cas. at 1075.[16]

We believe it incorrect to treat the element of "continuance" as dispensable, given the constitutional text, the extensive practice and precedent (including *Maurice*) before the Civil War, and the Supreme Court's authoritative opinions in *Germaine* and *Auffmordt*. The Attorney General was correct in 1907 when he affirmed that "the idea runs through all the cases that in order to constitute an office the employment must be continuing and not temporary," relying particularly on *Maurice*, his 1898 opinion on the Bering Sea commission, and *Germaine*. *Appointment—Holding of Two Offices—Commissioner of Labor*, 26 Op. Att'y Gen. 247, 249 (1907). The Supreme Court of Mississippi was likewise correct in *Shelby* in 1858 when, relying particularly on *Maurice*, it "apprehend[ed] that it may be stated as universally true, that where an employment or duty is a continuing one, which is defined by rules prescribed by law and not by contract, such a charge or employment is an office." 36 Miss. at 289. Yet "continuance" is not "permanence"; no case of which we are aware before the Civil War indicates that permanence is required, and the post-Civil War authority just discussed is best read as simply confirming that some temporary, non-personal positions may amount to offices. As Mechem himself put it, "certainly a position which is merely temporary *and* local cannot *ordinarily* be considered an office." Mechem § 8, at 6 (emphases added).

### 2. Defining a "Continuing" Position

No definition of "office" can be expected to harmonize all of the precedent or answer all cases that may arise. (Thus, our discussions of early authority should not be understood as necessarily endorsing every holding.) But the following two general rules encompass and harmonize most of them, particularly the earliest ones, with regard to the element of continuance or duration: First, an office exists where a position that possesses delegated sovereign authority is permanent, meaning that it is not limited by time or by being of such a nature that it will terminate "by the very fact of performance." *Bunn*, 45 Ill. at 405. This rule is particularly laid out in the early *Kennon* case, which found an office to exist because the defendants were "to exercise continuously, and as a part of the regular

---

[16] *Cf. Ex parte Siebold*, 100 U.S. 371, 397–98 (1879) (holding that Appointments Clause was not violated when Congress authorized courts of law, rather than President or head of a department, to appoint election supervisors for a particular local election; not discussing question of continuance or citing *Germaine* or other cases); *In re Hathaway*, 71 N.Y. 238, 244 (1877) (court divided 4-3 in holding that person appointed as surrogate for a particular probate case was not a public officer under state constitution, because he performed "transient, occasional or incidental duties" for "special exigencies," having "no general powers . . . to act in respect to all like cases").

and permanent administration of the government, important public powers, trusts, and duties." 7 Ohio St. at 562–63; *see also Sheboygan v. Parker*, 70 U.S. 93, 96 (1865) (applying this formulation); *Patton v. Bd. of Health*, 59 P. 702, 706 (Cal. 1899) (after survey, providing similar summary of the "reasonably well settled" rule for positions with "continuing and permanent" duties). The "continuing" *duties* and *powers* to which these cases refer should not, however, be understood as necessarily involving continuous *activity*, as shown in *Kennon* itself, which involved a standing power to appoint to and remove from specified offices. *See* 7 Ohio St. at 557. Similarly, a federal judge holds a permanent position even if he has a lull in his docket. His "services are general and indefinite in a line of duty," *Deputy Clerks*, 29 Op. Att'y Gen. at 596, and he has "general functions" and a "claim or right to be designated, or to act" should a case arise, *Auffmordt*, 137 U.S. at 327.

Second, if a position that possesses delegated sovereign authority is temporary (because of, for example, an express expiration date or the nature of its duties), then whether it qualifies as "continuing," and thus an office, will depend on the presence of three factors that the early authorities discuss in connection with temporariness. The line will not always be bright, as *Kennon* recognized in declining to say "*[h]ow far the general assembly may go* in constituting temporary agencies and commissioners for temporary, incidental, transient, or occasional purposes . . . without thereby creating an office," 7 Ohio St. at 559 (emphasis added); but it can be discerned. (1) The position's existence should not be personal: The duties should "continue, though the person be changed," *Maurice*, 26 F. Cas. at 1214, and an incumbent's tenure should not depend on whether "the office of his superior" is vacated, *Hartwell*, 73 U.S. at 393; *see also Tenure of Office*, 2 Op. Att'y Gen. at 412; Corwin, *President* at 85. (2) The position should not be "transient": The less fleeting and more enduring it is (or is likely to be), the more likely it is to be a continuing seat of power and thus an office. (3) The duties should be more than "incidental" to the regular operations of government. Although these last two factors escape precise definition, and the last of them does not directly bear on a temporal aspect, they nevertheless appear throughout the early authority—in *Pool*, *In re Oaths*, and *Kennon*, for example; and they capture other authority employing similar terms—such as special work; special purposes; a special, specific, single, or particular controversy or case; a special commission; specified claims; local or limited work; and extraordinary or emergency exigencies. *See, e.g.*, *Auffmordt*, 137 U.S. at 326–27; *Germaine*, 99 U.S. at 512; *Inspector of Customs*, 4 Op. Att'y Gen. at 163; *Marine Corps*, 2 Op. Att'y Gen. at 78–79; Hamilton, *The Defence* No. 37, *in* 20 *Papers of Alexander Hamilton* at 20; *see also Eliason*, 86 N.C. at 241 ("The true test of a public office seems to be that it is parcel of the administration of government."); Corwin, *President* at 85 (an "office" at common law was an "*institution*" to which "certain frequently recurrent and naturally coherent duties [were] assigned more or less permanently"). Thus, the

nature of the delegated sovereign authority will affect whether a temporary position is an office, even though a person holding a *permanent* position "is not the less a publick Officer where his Authority is confined to narrow Limits." *Burnell*, Carth. at 479; *see also Shelby*, 36 Miss. at 277 (similar). One reason for considering whether a position is "incidental" is to ensure against evasion of the Appointments Clause: For example, the position of Attorney General presumably still would be an office if Congress provided for it to expire each year but re-authorized it annually.

### 3. A Few Recurring Areas

The element of continuance provides an additional reason why a typical contractor does not, and need not, hold an office for purposes of the Appointments Clause. *Maurice* focused on continuance in explaining the distinction between an office and a contract (even while recognizing that one might contract to carry out an office). *See* 26 F. Cas. at 1214–15. *Hartwell* explained that a "government contract . . . from its nature is necessarily limited in its duration and specific in its objects," unlike a government office. 73 U.S. at 393. And the Court held in *Hall*, discussed above in Part II.A.3, that certain persons did not hold offices because they were analogous to "parties who, pursuant to law, enter into stipulations *limited in point of time*, with a State, for the erection, alteration, or repair of public buildings, or to supply the officers or employees who occupy them with fuel, light, stationery, and other things necessary for the public service." 103 U.S. at 10 (emphasis added). Similarly, Attorney General Wirt determined that "an engagement with a gentleman of the bar, whereby, for a valuable consideration, he is to render his professional services *in a given case*, is a contract, a bargain, an agreement, in the legal sense of these terms," not an appointment to an office, and therefore was covered by a statute barring contracts between members of Congress and federal officers. *Contracts With Members of Congress*, 2 Op. Att'y Gen. 38, 40 (1826) (emphases altered); *see id*. (referring to contracts "for the service of a lawyer, a physician, or a mail carrier, an army purveyor, or a turnpike road maker"). He also interpreted the "office" of architect of the public buildings to be a contractual position rather than an office, where the architect had been hired to complete "specified work" of "a temporary and limited character," rather than to occupy a position "of a permanent nature." *Contract With Architect*, 5 Op. Att'y Gen. at 754, 756; *see id*. at 755–56 (recognizing the frequency of annual contracts). Finally, as discussed above in Part II.A.3, the House of Representatives in 1806 resoundingly rejected the claim that a contractor held an office within the meaning of the Incompatibility Clause. Mail carriers provided a recurring example of contractors, *see* 15 Annals of Cong. at 880, 883, 885, 887, 890, and contracts to carry the mail were limited to one year, *see* White, *Federalists* at 182; *see also* 15 Annals of Cong. at 882 (statement of Rep. Randolph, in favor of resolution, that "a

contractor is an officer *pro tempore*—it is not an office in perpetuity, but created for a time, and for a particular purpose").

The element of continuance also justifies our previous conclusion that authorizing a private plaintiff to bring a *qui tam* suit on behalf of the United States under the False Claims Act, *see* 31 U.S.C. § 3730 (2000), does not violate the Appointments Clause, because a *qui tam* relator does not hold an office. Our current reasoning does, however, differ some from that previously given, under which it was sufficient that the relator was not employed by the federal government. *See Separation of Powers*, 20 Op. O.L.C. at 146 & n.65. A *qui tam* relator does at least present a question under the Appointments Clause, *see Vt. Agency of Natural Res. v. United States*, 529 U.S. 765, 778 n.8 (2000) (raising and reserving the question), because Congress has allowed him essentially to appoint himself to act as a civil prosecutor for the United States in a case. But such an "appointment" is a temporary and personal one, likely involving only occasional duties, and extending only to a single case; and the relator's authority even over that case is confined in certain ways. *See id.* at 769–70, 772–73; *see also United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 805 (10th Cir. 2002) (finding no Appointments Clause violation, where relators "are not subject to the requirement . . . that the definition of an officer 'embraces the ideas of tenure, duration, emolument, and duties, and the latter were continuing and permanent, not occasional or temporary'") (quoting *Germaine*, 99 U.S. at 511–12, citing *Auffmordt*, 137 U.S. at 327, and concluding that *Buckley* must be "construed in conformity" with them). In this respect, the *qui tam* relator is similar to the contractors discussed above; and thus, whatever the relevance of his "appointing" himself (in contrast to a person who contracts with the government), the distinction does not pose a problem under the Appointments Clause. For similar reasons, we reaffirm our prior conclusion (but not all of its reasoning) that the federal government's participation in binding arbitration ordinarily does not raise an Appointments Clause problem. *See, e.g., Separation of Powers*, 20 Op. O.L.C. at 148–49; *see also supra* note 14 (discussing dispute-resolution proposal by President Cleveland).

At the same time, the element of continuance, properly understood, also explains why an "independent counsel" under the Ethics in Government Act of 1978, 28 U.S.C. §§ 591–599 (1982 ed., Supp V), undoubtedly *was* an officer, even though the position was, by the nature of its duties, temporary and largely case-specific. The Court in *Morrison v. Olson*, 487 U.S. 654 (1988), thought it "clear that appellant is an 'officer' of the United States, not an 'employee,'" citing *Buckley*'s discussion of this distinction based on *Auffmordt* and *Germaine*. *Id.* at 671 n.12. Justice Scalia in dissent agreed, adding that none of the parties disputed this, the only question being whether the counsel was a principal or inferior officer. *Id.* at 715. Although the position of a particular independent counsel was temporary, the position was non-personal; it was not "transient," but rather

indefinite and expected to last for multiple years, with ongoing duties, the hiring of a staff, and termination only by an affirmative determination that all matters within the counsel's jurisdiction were at least substantially complete; and it was not "incidental," but rather possessed core and largely unchecked federal prosecutorial powers, effectively displacing the Attorney General and the Justice Department within the counsel's court-defined jurisdiction, which was not necessarily limited to the specific matter that had prompted his appointment. *See id*. at 660–64 (opinion of Court), 667–68, 671; *id*. at 718 (Scalia, J., dissenting).

## C. Several Additional Criteria Are Incidental, Not Distinct Elements of an Office

Courts and others have sometimes discussed several additional criteria, beyond the two elements of delegated sovereign authority and continuance detailed above, as relevant to whether a position is a public office and when an individual is an officer. We discuss five of these, explaining that they are incidents that commonly follow from the existence of a properly constituted office, not essential elements of an office. They may provide evidence of whether an office exists under the two essential elements, but, depending on the circumstances, an office subject to the Appointments Clause may exist without them.

### 1. Method of Appointment

First, courts sometimes have considered a person's status as an officer by reference to his method of appointment. The Supreme Court has considered an individual's appointment pursuant to the procedures of the Clause in determining that he was an "officer" for certain statutory purposes. For example, the Court in *Wise v. Withers*, 7 U.S. (3 Cranch) 331 (1806), held that a justice of the peace was an officer under a militia-exemption statute given that he was appointed by the President: "Under the sanction of a law, he is appointed, by the president. . . . We know not by what terms an officer can be defined, which would not embrace this description of persons." *Id*. at 336. In *Hartwell*, one reason the Court held that a Treasury clerk was an officer of the United States under an embezzlement statute was that he "was appointed by the head of a department within the meaning of the constitutional provision upon the subject of the appointing power." 73 U.S. at 393–94. The statutory cases on receivers of national banks discussed above in Part II.B.1 employed some of the same reasoning. Conversely, courts also have concluded that an individual who is *not* appointed in accordance with the Appointments Clause is not technically an "Officer of the United States." *Maurice* concluded that an agent *not* appointed in accordance with the Appointments Clause was "not legally an officer" (even though he had carried out the duties of a duly constituted office). 26 F. Cas. at 1216. In *United States v. Smith*, 124 U.S. 525 (1888), the Court held that a clerk in the office of a collector of customs was

not a "public officer" under an embezzlement statute because he was not appointed consistent with the Clause: "An officer of the United States can only be appointed by the President, by and with the advice and consent of the Senate, or by a court of law, or the head of a department. A person in the service of the government who does not derive his position from one of these sources is not an officer of the United States in the sense of the constitution." *Id.* at 531–32; *see also Germaine*, 99 U.S. at 509–10 (similar); *Burnap v. United States*, 252 U.S. 512, 516 (1920) ("Whether the incumbent is an officer or an employee is determined by the manner in which Congress has specifically provided for the creation of the several positions, their duties and appointment thereto.").

It is true that an individual not properly appointed under the Appointments Clause cannot technically be an officer of the United States: "Unless a person in the service of the Government, therefore, holds his place by virtue of an appointment by the President, or of one of the courts of justice or heads of Departments authorized by law to make such an appointment, he is not, *strictly speaking*, an officer of the United States." *United States v. Mouat*, 124 U.S. 303, 307 (1888) (emphasis added). But such a person may nevertheless be *required* to be appointed as prescribed by the Clause in order constitutionally to exercise his authority. A contrary conclusion would render the Appointments Clause a matter of etiquette or protocol, *see Buckley*, 424 U.S. at 125, rather than one of the "significant structural safeguards of the constitutional scheme," *Edmond*, 520 U.S. at 659. *See supra* Part I; *cf. Kennon*, 7 Ohio St. at 557–58 ("The official or unofficial character of the defendants is to be determined, not by their name, nor by the presence or absence of an official designation, but by the nature of the functions devolved upon them."). Under such a (tautological) reading, the Clause would require a certain means of appointment only for persons appointed by that means. As early as *Maurice* it was recognized that a person might in fact perform the duties of an office under the United States and yet have been unconstitutionally appointed to it. This truth also is recognized in the common law doctrine of de facto officers, by which the acts of a person not properly appointed to office might nevertheless be held valid. *See* Mechem § 26, at 10 (summarizing doctrine); *id*. §§ 315–345, at 211 *et seq*. (chapter concerning "officers de facto"); *see also Inspectors of Customs*, 4 Op. Att'y Gen. at 165 (apparently assuming applicability of doctrine in event of constitutional challenge to appointment); *Ryder v. United States*, 515 U.S. 177, 180–84 (1995) (discussing doctrine but declining to apply it in a "timely challenge to the constitutional validity of the appointment of an officer who adjudicate[d]" a court-martial). At the same time, the Appointments Clause does not prevent Congress from treating a position that is not, in the constitutional sense, an office under the United States as nevertheless subject to statutory restrictions on offices or officers. *See* Corwin, *President* at 91 (noting that Congress often has done this); *Steele v. United States*, 267 U.S. 505, 506–08 (1925) (in dicta, construing statutory reference to "a civil officer" as not limited to

"an officer in the constitutional sense" and including a general prohibition agent appointed by the Commissioner of Internal Revenue and a deputy marshal appointed by a marshal); *see also supra* Part II.B.1 (discussing Senate-confirmed commissioners under Jay Treaty); *cf. Employee's Compensation Act—Assistant United States Attorney*, 31 Op. Att'y Gen. 201, 202–04 (1918) (recognizing that Congress might provide for appointment to position by President or head of department even though position was not an office, in which case one must analyze duties to determine position's nature).

### 2. Established by Law

Second, other authorities have stated that an office is created by law. This statement, like the proposition that a person must be appointed consistent with the Appointments Clause to be an officer, is true in one sense, and "law" can be highly relevant to whether an office exists, but the statement also can confuse the analysis if not properly understood. The Appointments Clause does provide that offices not recognized by the Constitution itself "shall be established by Law," thus lodging in Congress ultimate authority over the creation of most offices. U.S. Const. art. II, § 2, cl. 2; *see Maurice*, 26 F. Cas. at 1213–14; *Limitations on Presidential Power to Create a New Executive Branch Entity to Receive and Administer Funds Under Foreign Aid Legislation*, 9 Op. O.L.C. 76, 77–78 (1985).[17] The Ineligibility Clause reinforces this view, by providing that "[n]o Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, *which shall have been created*, or the Emoluments whereof shall have been encreased during such time," thereby contemplating that Congress will authorize offices, and reducing the incentive for members of Congress to do so in hopes of being appointed to them. U.S. Const. art. I, § 6 (emphasis added). Thus, an office subject to the Appointments Clause will ordinarily be a position that has been "established by Law"—by or under authority of a statute. But the rule for which sorts of positions have been "established by Law" such that they amount to offices subject to the Appointments Clause cannot be whether a position was formally and directly created as an "office" by law. Such a view would conflict with the substantive requirements of the Appointments Clause. Congress could not evade the Appointments Clause by, for example, the artifice of authorizing a contract for the supervision of the Justice Department, on the ground that no "office" of Attorney General would be created by law—even

---

[17] The President has authority to appoint to diplomatic offices without an authorizing act of Congress, because the Constitution itself expressly recognizes such offices under the law of nations. *See*, *e.g.*, *Ambassadors*, 7 Op. Att'y Gen. at 192–93; *Nomination of Sitting Member of Congress to be Ambassador to Vietnam*, 20 Op. O.L.C. 284, 286–92 (1996). Regarding the time at which such an office is considered created, see *id*. at 292–93.

where the statutory authorization for the contract were to delegate sovereign authority and establish the continuance of the contractual position. *Cf. Maurice*, 26 F. Cas. at 1214, 1219 (recognizing that the government might enter into "a contract to perform the duties of" a properly established office, but that such a contract would be an "irregular" appointment that would violate the Appointments Clause). Conversely, a contract or other mere employment "may be created by law," Mechem § 5, at 5, and governmental contracts long have been highly regulated, *see*, *e.g.*, *Validity of Executive Order Prohibiting Government Contractors From Discriminating in Employment Practices on Grounds of Race, Color, Religion, or National Origin*, 42 Op. Att'y Gen. 97, 98–103 (1961) (collecting examples). Contracts do not, simply because created or regulated by law, create an office.

Thus, whether an office has been established by law does not turn on whether Congress has formally created an "office" by law, but rather on whether the two necessary elements of an office discussed above in Parts II.A and II.B are present "by law." The Constitution requires an examination of "the nature of the functions devolved upon" a position by legal authority, *Kennon*, 7 Ohio St. at 558, not the way or form in which they are devolved. Any position that is an office in the constitutional sense under the two elements we have described, and has not been created *ultra vires*, will have been created by law in some fashion, regardless of how labeled. It necessarily follows that "the fact that *the powers in question* are created and conferred by law, is an important criterion," and that an office "finds its source and limitations in some act or expression of the governmental power." Mechem § 5, at 5 (emphasis added); *see id*. § 1, at 1 (powers of an office are "created and conferred by law"). To be subject to the Appointments Clause, a position must include *some* continuing legal authority, as opposed to simply existing to assist someone who does have legal authority or having duties defined and existing only at the whim of its superior: There must be some sort of "line of duty prescribed by law," *Deputy Clerks*, 29 Op. Att'y Gen. at 595–96, and power "defined by rules prescribed by law," *Shelby*, 36 Miss. at 289. As *Buckley* and many other authorities thus recognize, the source of any such authority, and particularly any statutory delineation by Congress, will unavoidably help to determine whether an office exists. *See*, *e.g.*, *Buckley*, 424 U.S. at 131, 141 (referring, respectively, to "responsibility under the public laws" and duties "exercised pursuant to a public law"); *Freytag*, 501 U.S. at 881 (noting that duties of a special trial judge were "specified by statute," and contrasting special masters, hired "on a temporary, episodic basis, whose positions are not established by law, and whose duties and functions are not delineated in a statute"); *id*. at 901 (opinion of Scalia, J.) (agreeing with this analysis); *Applicability of Appointment Provisions of the Anti-Drug Abuse Act of 1988 to Incumbent Officeholders*, 12 Op. O.L.C. 286, 288 n.5 (1988) (noting that Congress had by statute authorized Attorney General to create subordinate offices, which he had done by order); *Maurice*, 26 F.

Cas. at 1213–15 (concluding that, at least for purposes of a suit to enforce a purported officeholder's bond, the office of agent of fortifications had been created by congressionally approved and authorized Army regulations); *Barton*, 24 F. Cas. at 1027 (explaining background rule that, where no law specifies otherwise, a deputy has "the same powers and duties" as his principal); Mechem § 570, at 373 (same); *Ambassadors and Other Public Ministers*, 7 Op. Att'y Gen. at 193, 196–97, 202, 212 (discussing sources of authority of diplomatic offices, even though not created by statute). As Mechem put it: "The authority of a public officer in any given case consists of those powers which are expressly conferred upon him by the act appointing him, or which are expressly annexed to the office by the law creating it or some other law referring to it, or which are attached to the office by common law as incidents to it." Mechem § 507, at 332.

### 3. Oath of Office

Third, although "[p]ublic officers are usually required by law to take the oath of office," doing so "is not an indispensable criterion and the office may exist without it, for . . . the oath is a mere incident and constitutes no part of the office." Mechem § 6, at 6; *see also Oath of Clerks in Executive Departments*, 12 Op. Att'y Gen. 521, 521–22 (1868) (similar). Article VI, Clause 3, of the Constitution requires that "all executive and judicial Officers, both of the United States and of the several States" take an oath or affirmation to support the Constitution. Only after *separately* knowing whether an office exists could one apply this requirement. *Burnell* demonstrates this, as the applicability of an oath requirement turned on whether the Censor of the College of Physicians held an office. *See* Carth. at 478; *see also Opinion of the Justices*, 3 Greenl. (Me.) at 483 (similar). Similar reasoning applies to a bond, which is "usually required" of officers "to whom are entrusted the collection and custody of public money, and public ministerial officers whose actions may affect the rights and interests of individuals." Mechem § 263, at 165; *see id*. §§ 253–254, at 162 (oath and bond requirements are common for persons appointed to a public office); *see also* 1 *Hinds' Precedents* at 608 (1898 report, concluding that certain commissioners were not officers, in part because "they give no bond and take no oath").

### 4. Emoluments

Fourth, an emolument is also a common characteristic of an office, as *Hartwell* indicates, 73 U.S. at 393, but it too is not essential: "Like the requirement of an oath," provision for pay "may aid in determining the nature of the position, but it is not conclusive. . . . As in the case of the oath, the salary or fees are mere incidents and form no part of the office." Mechem § 7, at 6; *see id*. at 6 n.3 ("it is not a *sine qua non*"); *Kennon*, 7 Ohio St. at 559 ("That compensation or emolument is a usual incident to office, is well known; but that it is a necessary element

in the constitution of an office, is not true."). Confirming this, the law of public offices recognized offices of profit, "to which salary, compensation or fees are attached," Mechem § 13, at 8, and offices of honor, "to which no compensation attaches," *id.* § 15, at 9. *See also Emoluments Clause*, 29 Op. O.L.C. at 61 (discussing offices of profit). The Constitution recognizes both types of offices. *See, e.g.*, U.S. Const. art. I, § 3, cl. 7 (punishment for impeachment may include "disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States"). In addition, it separately creates the office of President, *id.* art. II, § 1, cl. 1, and provides for its compensation, *id.* cl. 7. If Presidents were to serve without pay, as Benjamin Franklin had proposed, *see* James Madison, *Notes of Debates in the Federal Convention of 1787*, at 51–55 (June 2, 1787) (1987), they would no less hold an office.

Furthermore, any understanding of an "office" that would require an "emolument" akin to the compensation that a person on the regular payroll of the federal government receives would conflict with the original meaning of the Appointments Clause as revealed by earliest practice. In the first decade under the Constitution, most federal officers, particularly those outside the capital, received no compensation from the government, much less a regular one. Instead, they received authority to collect fees:

> By far the larger number of federal officials were compensated by fees for services rendered. Nearly the whole of the field service was paid on this basis, including the collectors, naval officers, and surveyors; the supervisors and inspectors of revenue; the attorneys and marshals; the deputy postmasters; and the consuls. . . . Officials were compensated if there was a demand for their services; otherwise the government expended nothing. They were paid on the spot, by those whom the law required to deal with them. There was no problem of collection—the self-interest of the official was sufficient. Public posting of the schedule of fees and stern laws against taking excessive amounts were relied upon to protect the public. English precedent and contemporary convenience spread the system far and wide.

White, *Federalists* at 298. To take one example, many consuls were compensated through the following schedule of fees: two dollars from a U.S. citizen for authenticating a protest, declaration, or deposition; five percent of a citizen's estate for taking it into possession and settling it; twenty-five cents for administering oaths and affirmations; and a dollar for certifying the delivery of merchandise. *See* 1 *Am. St. Papers, Misc.* at 307. Officials so compensated were no less officers of the United States. At the same time, where a temporary position does include emoluments provided by the government, the nature of the pay may provide some evidence of whether the position is an office under the factors discussed in Part II.B.2. In cases holding that temporary positions were not offices, courts have

remarked that the pay provided was per diem or otherwise based on the amount of work done, rather than involving a salary. *See*, *e.g.*, *Bunn*, 45 Ill. at 409; *Germaine*, 99 U.S. at 512; *see also Shepherd v. Commonwealth*, 1 Serg. & Rawle 1 (Pa. 1814) (commissioner regarding land claims, paid by the day); 39 Annals of Cong. at 1408–10 (examiner of land offices, paid by the day).

Recognizing the various kinds of emoluments that may attach to an office, and the incidental nature of having *any* emolument, demonstrates the error of some of our prior opinions in concluding that the Appointments Clause does not apply to persons who are not employees of the federal government, even if they are delegated permanent federal authority to enforce federal law. *See*, *e.g.*, *Separation of Powers*, 20 Op. O.L.C. at 145–48. The primary cases on which we relied for this view—*Maurice*, *Hartwell*, *Germaine*, and *Auffmordt*, all discussed above—do not resolve this question, and to the extent they speak to it do not clearly point in the direction that our prior opinions took. Only *Auffmordt* directly confronted the requirements of the Appointments Clause, but its holding does not turn on whether a person is an employee (as opposed to the nature of his duties), nor did the Court hold or state that a private actor cannot be an officer, which would have been at odds with *Maurice*'s recognition that a *contractor* might hold a position in violation of the Appointments Clause.

In addition, the general language of these cases allows for an office that does not involve government employment in the modern sense. *Maurice*, for example, said that an office is "*a public charge or* employment," 26 F. Cas. at 1214 (internal quotation marks omitted; emphasis added), and *Hartwell* defined an office as "*a public station, or* employment," 73 U.S. at 393 (emphasis added). *Maurice*, among others, also does state that an "office is 'an employment,'" 26 F. Cas. at 1214, but such a statement must be read in a contemporaneous rather than anachronistic sense, broadly to include anyone engaged by the government, whether an independent contractor, "employee," or other agent. The pertinent definition of "employ" is:

> To engage in one's service; to use as an agent or substitute in transacting business; to commission and entrust with the management of one's affairs. The president *employed* an envoy to negotiate a treaty. Kings and States *employ* ambassadors at foreign courts.

Noah Webster, *An American Dictionary of the English Language*, *tit.* Employ (1828). Thus, even an "agreement" to provide services (such as "to make hay" or "plough land") was an "employment." Jacob, *tit*. Office; Cunningham, *tit.* Office. As detailed above regarding contractors (*see supra* Parts II.A.3.b & II.B.3) and the creation of offices "by law" (*see supra* Part II.C.2), what matters is the nature of a position—its authority and continuance—not its label, and thus not whether Congress placed it within the federal service. Our prior analysis, notwithstanding its conclusion, went far toward acknowledging this when it recognized the

relevance to Appointments Clause analysis of *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), in which the Court held that the First Amendment applied to a federally created corporation notwithstanding a statute providing that the corporation was not a department, agency, or instrumentality of the government. *See Separation of Powers*, 20 Op. O.L.C. at 147–48 & n.70.[18]

### 5. Commission

Finally, although the holder of an office usually receives a commission, that characteristic too, like an oath or pay, is incidental rather than essential. *See* Mechem § 12, at 8. The Constitution, in Article II, Section 3, requires that the President "shall Commission all the Officers of the United States." As with the oath requirement, as well as the recognition that offices are created by law, one must know who the officers are before being able to apply this provision. That a person has a commission may no doubt provide evidence that he holds an office. *See*, *e.g.*, 15 Annals of Cong. at 888–89 ("There is a Constitutional definition of the word officer in the third section of the second article of the Constitution, which provides that the President 'shall commission all the officers of the United States.' Here then is a Constitutional definition of what is meant by a person holding an office, *viz.*, a person commissioned by the President.") (Rep. Bidwell). But it does not follow that a person not commissioned does not hold an office, or, conversely, that only officers have commissions.

### III. Conclusion

For all of these reasons, we conclude that an individual who will occupy a position to which has been delegated by legal authority a portion of the sovereign powers of the federal government, and which is "continuing," must be appointed pursuant to the Appointments clause. Conversely, a position that does not satisfy one of these two elements need not be filled pursuant to that Clause.

STEVEN G. BRADBURY
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[18] Similarly, whether for constitutional purposes a person within the federal government is a mere "employee" or rather holds an office subject to the Appointments Clause will turn on the applicability of the two essential elements we have set out. *See generally Buckley*, 424 U.S. at 126 n.162.